K.A.C., the father, appeals from a judgment terminating his parental rights as to a minor child, K.A. The trial court also terminated the mother's parental rights; however she does not appeal.[1]
The Jefferson County Department of Human Resources, ("DHR"), in May 1998, petitioned for termination of the mother and father's parental rights, stating that K.A. was dependent and in the legal custody of DHR "due to the substantial risk of harm that the child was in because of the *Page 939 
father's physical abuse of the mother, the child, and [the child's] siblings and, subsequently, due to the mother being unable or unwilling to provide a suitable home for the child." DHR had obtained temporary custody of the child in February 1997, after the mother had filed a protection-from-abuse petition; she had been residing in a women's shelter, but had left the shelter with her children and without a suitable place to live.
Following ore tenus proceedings, the court, on September 30, 1998, entered a detailed order, finding that the child was dependent. As it pertained to the father, the court stated:
 "[K.A.C.] has completed the tenth grade and is 21 years old. The father was raised from the age of two in ten or more foster homes due to neglect and possible abuse by his parents. At about age ten, the father was placed in [a] foster home. . . . Over the years, the father was involved sporadically in psychiatric treatment and at age 16 was admitted to Hillcrest Hospital due to suicide threats. This admission occurred during the father's early relationship with [the mother], his future wife. He married [the mother] when he was 17 years old.
 "[K.A.C.] . . . abused amphetamines during at least two periods of his life. He also abused alcohol before and during his marriage, becoming intoxicated and verbally and physically abusive to his wife and her children, using a belt to discipline [the] two-year-old . . . and four-year-old. In March, 1997, after the restraining order had been entered against the father by this court, he was convicted of criminal harassment and trespass regarding an incident with the mother.
 "At the time of the filing of the petition herein, the father was without a stable home or work. However, he soon began living with a brother who lived and worked as a groundskeeper at a cemetery. During the pendency of this case, the father has held numerous jobs although he has not maintained employment for any length of time at any one location. Although employed, he has not provided support for his child while he has been in the custody of [DHR]. The father has maintained regular visitation with his child.
 "In July of 1997, six months after the filing of the petition herein and before his divorce from [the mother] was final, [K.A.C.] met C.H., who was residing at the Salvation Army women's shelter. Five months later, on December 4, 1997, K.A.C. married C.H. (C.H.C.) and their first child, S.C., was born on August 17, 1998, three weeks before the hearing in this case began.
 "C.H.C. is twenty years old and is the daughter of D.H and B.H., intervenors in this case. At the age of 17, C.H.C. was admitted to Bradford Hospital due to marijuana abuse. Just prior to this hearing, she completed a period on probation after being granted Youthful Offender status for check forgery.
 "Prior to her arrest for the forgery, C.H.C. had been addicted to crack cocaine. As a term of her probation she completed outpatient drug rehabilitation after her release.
 "K.A.C. now resides with his wife and [their] infant daughter in a house rented from his wife's grandparents. Although he has had problems in the past relating to his alcohol abuse, he is not regularly involved in following the alcohol treatment plan recommended to him by his counselor and denies that he has a problem with alcohol. The father's alcohol counselor testified that the prognosis for the father and his current wife is poor if he does not follow his treatment plan.
 "K.A.C. has moved from a state of homelessness, violence and alcohol abuse to a life of a young, employed husband and father in a short time. From the testimony of K.A.C. and his current wife, there is little insight into any future problems which may arise between *Page 940 
them; however, the court finds that the prospects for long-term stability in this marriage are not good."
Further, the court found that the mother and father were unwilling and unable to provide and care for K.A. now or in the foreseeable future; that there were no relatives seeking custody of the child; and, therefore, that it was in the best interests of the child to terminate the rights of the parents and to allow the child to be eligible for permanent placement. The father appeals.
The termination of parental rights is a drastic measure, and the courts gravely consider such action. Ex parte Beasley, 564 So.2d 950
(Ala. 1990). A natural parent's right to the custody of his or her child is outweighed only by clear and convincing evidence indicating that a termination of parental rights is in the best interests of the child. L.N. v State Dep't of Human Resources, 619 So.2d 928 (Ala.Civ.App. 1993). This court has consistently held that the trial court must apply a two-pronged test when a nonparent institutes proceedings seeking the termination of parental rights. See K.M. v. Shelby County Dep't of HumanResources, 628 So.2d 812 (Ala.Civ.App. 1993). First, the court must determine that the child is dependent, according to clear and convincing evidence. Second, the court must find that there exists no viable alternative to termination of the parent's custodial rights. J.L.v. State Dep't of Human Resources, 688 So.2d 868,869 (Ala.Civ.App. 1997). Although a child's parents have a prima facie right to custody, the paramount concern in these proceedings is the best interests of the child. Id.; see also, S.W. v.Walker County Dep't of Human Resources, 709 So.2d 1267
(Ala.Civ.App. 1998).
 "`The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the children. The trial court shall consider whether the parents have abandoned their children, whether the parents have problems with drugs or alcohol, and whether reasonable efforts to rehabilitate the parents have failed. If the children are not in the physical custody of their parent or parents, the trial court shall also consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached administratively or judicially.'"
A.R.E. v. E.S.W., 702 So.2d 138, 139 (Ala.Civ.App. 1997) (quoting M.H.S. v. State Dep't of Human Resources, 636 So.2d 419,421 (Ala.Civ.App. 1994) (citations omitted).
Although the trial court focused most of its findings on K.A.C.'s prior history in determining he could not properly parent his minor child, we note that the father's recent evaluations do not support this conclusion. In August 1998, Susan Mooney, the father's counselor at the Alcohol and Drug Abuse Council ("ADAC"), reported that the father had attended the majority of his sessions; that he had attended Alcoholics Anonymous meetings, as recommended; and that the father's prognosis "is very good at this time." The Family Skills Center reported that the father and his current wife had jointly attended three parenting classes and that the father had attended seven sessions from September 1997 through February 1998. In September 1997, the father was referred by DHR to the Physicians Psychiatric Clinic for an evaluation. The psychiatric evaluation stated that the father had a verbal I.Q. of 73; that he was reading at the 5th-grade level; that his MMPI profile was within normal limits; and that there was "no evidence of depression, anxiety, a personality disorder, or underlying psychosis." Further, the doctor found that the father was "competent to be a parent to his young child" and recommended that, because *Page 941 
of the father's history of alcohol abuse, he needed to be involved in an ongoing alcohol-treatment program.
The majority of the reports submitted by DHR and the court-appointed special advocate ("CASA") volunteer focused on the mother; however, we note the following as they pertain to the father:
1998 CASA report:
 "[K.A.C.] has made and continues to make progress. He has a steady job, stable housing and attends church regularly. He has a reliable support system. He has been consistent in visiting his son. My primary concern is that he has so many issues to deal with: his own recovery; a new marriage, a baby on the way and a wife with less than 7 months clean time from cocaine abuse. I appreciate his feelings, but I think that to place this very active 15-month-old [K.A.] in this house with two recovering people (one of whom is pregnant) would be asking for trouble. I do believe that, given time, he and his wife will be able to handle having the toddler in the home permanently. I strongly believe that unsupervised visitation in his home on a weekly basis, then overnight or weekend visitation would be the best way to determine suitability."
(Emphasis added.) September 1998, DHR report:
 "From my understanding of this case, [K.A.C.] has complied with all court requirements. His completion has not always been timely or completely satisfactory but to the best of my understanding, he has completed the requirements."
At trial, the caseworker who submitted the September 1998 report stated that DHR's efforts to help the father rehabilitate himself consisted of trying to assist K.A.C. in "meeting court requirements, evaluating [the father's] home, observing visits with his children. And that's basically it." The caseworker further stated that the father was in compliance with his requirements as stipulated in the Individual Servicing Plan ("ISP"). We note that a former caseworker assigned to the father during his years in foster care reported that, based on her observations, the father appeared to be the more nurturing parent of the two minor children in his first marriage; that there were allegations of domestic violence by both the mother and the father; and that nothing in the father's background would prevent him from rearing his minor child.
There was conflicting testimony regarding incidents of domestic violence. The mother had filed a protection-from-abuse petition after the father had left the home and informed her that he was suing for a divorce. The father vehemently denied ever hitting his former wife, with the exception of once striking her as a reflex when she had hit him in the groin; the mother confirmed that particular incident. The mother stated that there were three incidents where she tried to prevent the father from leaving their residence and he pushed her out of the way in an attempt to leave. Further, the mother stated that the father usually became violent when he had been drinking, but she admitted there had been instances when she hit him.
The mother did not present any evidence of abuse committed by the father toward her two older children. Although the mother accused him of accidentally burning one child with a cigarette while spanking him, upon further questioning she admitted that she had not seen a burn on the child but thought that the ashes from the cigarette may have fallen on the child. The father admitted that he had spanked the two children with a belt and that both he and the mother had used physical punishment to discipline the children.
The current wife testified that the father had not been violent or abusive toward her; that they were both attending counseling and treatment programs; that she had spent time with K.A. and that she welcomed the opportunity to be a mother to him. The current wife's grandfather testified that he was renting his old residence, which is next door to his home, to *Page 942 
the couple; that he visited their home on a daily basis; that the home was clean and neat; and that he had observed a good relationship between his granddaughter and her husband. The current wife's parents testified that they supported their daughter's marriage; that they visited the couple's home on a regular basis; and that they, as potential stepgrandparents, had initiated a relationship with the minor child through his current foster family. We note the trial court's criticism of the in-laws' conduct in establishing contact with the child; however, the in-laws intervened in this case to provide a potential family resource for the minor child. The record indicates that the father's biological parents are deceased; therefore, the father's "extended family" consists of his foster family; his current in-laws; and his two siblings. According to DHR records, K.A., who at the time of the hearing was 15 months old, had been placed in at least four foster homes since DHR obtained custody in 1997, and his current foster mother stated that she could no longer provide for him, because of her own physical condition.
Based on the evidence presented, we conclude that the termination of the father's parental rights was premature; that it was not supported by the evidence; and that DHR did not meet its burden of proving that there were no other viable alternatives available. See V.M. v. State Dep't of HumanResources, 710 So.2d 915 (Ala.Civ.App. 1998); L.A.G.v. State Dep't of Human Resources, 681 So.2d 596
(Ala.Civ.App. 1996). We, therefore, reverse the order terminating K.A.C.'s parental rights and remand the case for further proceedings consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
Robertson, P.J., and Monroe, Crawley, and Thompson, JJ., concur.
[1] The mother had had two other children before this child was born. The first child was born before the mother's marriage to K.A.C., and the second child was born after the marriage. The court determined that K.A.C. was not the father of this second child. The mother's parental rights were terminated as to all three children.