S.H., the father, and T.H., the mother, appeal from a judgment terminating their parental rights as to their two minor children. On March 15, 2000, the Calhoun County Department of Human Resources ("DHR") petitioned for termination of the mother and father's parental rights, stating that the children had been in the temporary custody of DHR since December 7, 1998; that the parents were unable or unwilling to discharge their parental responsibilities; that the parents had shown a lack of effort to adjust their circumstances to meet the needs of their children; that they had failed to maintain consistent contact or communication with the children; and that reasonable efforts at rehabilitation had failed. On June 6, 2000, Jay Watson, foster care/adoption coordinator for the Chickasaw Nation of Oklahoma, moved to intervene under the Indian Child Welfare Act ("ICWA"), P.L. 95-608,25 U.S.C.A. § 1901 et. seq.; the court denied the motion as untimely.
After conducting an ore tenus proceeding, the court, on September 28, 2000, entered an order terminating the mother and father's parental rights. The order stated, in part:
 "1. The subject children were adjudicated dependent on the 25th day of January 1999.
 "2. Since the date of the dependency adjudication, the Department of Human Resources, Guardian ad Litem, and parents of the subject children agreed upon certain steps which the children's parents would need to accomplish in order for their children to be returned to their custody.
 "3. The steps agreed upon by the Department of Human Resources, Guardian ad Litem, and children's parents included the parents' maintaining stable housing and stable employment.
 "4. The evidence presented demonstrated that the parents failed to maintain stable housing and stable employment and further, through much of the past eighteen (18) months, did not make legitimate attempts at maintaining stable housing and stable employment.
 "5. Prior to moving to the State of Alabama, the subject family had been investigated by family welfare agencies in the States of Oklahoma and Tennessee.
 "6. Evidence and testimony presented demonstrated that the children's parents repeatedly behaved inappropriately during visits with their children.
 "7. Evidence and testimony presented demonstrated that the children's parents failed to improve despite intensive intervention by agencies contracted by the Department of Human Resources to provide services and training for the parents in parenting skills and employment-seeking training.
 "8. Evidence and testimony presented demonstrated that the parents of the subject children had been arrested and convicted of theft and burglary.
 "9. Evidence and testimony presented at least presented concerns that the father of the subject children has inappropriate sexual tendencies, as the evidence was undisputed that the children's father had in his possession when the family left the State of Tennessee a magazine entitled `Family Fun,' which depicted families engaging in sexual relations with each other. The father's defense to this was that the magazine was a `gag gift' and that all of the participants *Page 687 
in the magazine were consenting adults."
Further, the court found that the mother and father were unwilling and unable to discharge their parental responsibilities; that reasonable efforts toward reunification had failed; that there were no suitable relative resources available; and that it was in the best interests of the children to terminate the rights of the parents.
The mother and father appeal, arguing that the court erred in failing to apply the mandatory provisions of the ICWA; and that the evidence did not support the trial court's judgment.
This court has consistently held that the trial court must apply a two-pronged test when a nonparent institutes proceedings seeking the termination of parental rights. See K.M. v. Shelby County Dep't of HumanRes., 628 So.2d 812 (Ala.Civ.App. 1993). First, the court must determine that the child is dependent, according to clear and convincing evidence. Second, the court must find that there exists no viable alternative to termination of the parent's custodial rights. J.L. v. State Dep't ofHuman Res., 688 So.2d 868, 869 (Ala.Civ.App. 1997). Although a child's parents have a prima facie right to custody, the paramount concern in these proceedings is the best interests of the child. Id.; see also,S.W. v. Walker County Dep't of Human Res., 709 So.2d 1267 (Ala.Civ.App. 1998).
 "`The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the children. The trial court shall consider whether the parents have abandoned their children, whether the parents have problems with drugs or alcohol, and whether reasonable efforts to rehabilitate the parents have failed. If the children are not in the physical custody of their parent or parents, the trial court shall also consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached administratively or judicially.'"
A.R.E. v. E.S.W., 702 So.2d 138, 139 (Ala.Civ.App. 1997) (quoting M.H.S.v. State Dep't of Human Res., 636 So.2d 419, 421 (Ala.Civ.App. 1994) (citations omitted).
The record reveals the following facts: The mother and father had previously lived in Oklahoma and Tennessee before moving to Alabama in 1998. According to the referral information from the Oklahoma Department of Human Services, the parents were investigated for inadequate housing and "a failure [of one of the children] to thrive," in 1997. That agency forwarded a referral to Tennessee in 1997, after the parents had informed it that they were moving. The record does not contain a report from the Tennessee social-service agency; however, Nancy Green, the Alabama DHR caseworker, testified that her investigation revealed that Tennessee had had "an unfounded failure to thrive report" and that the family had left before an investigation had been completed. She stated that DHR received a report in November 1998 indicating that the parties' 18-month-old child was in the road, unattended, and that neighbors had reported that the children had previously been left alone. She stated that when she observed the children, they "seemed to be okay" and that there was "nothing that would [have] been really concerning to me"; however, based on the reports from the two other states, the children were taken into protective *Page 688 
custody. She admitted that she did not find any issues initially investigated to be true; that there was no evidence of medical neglect or sexual abuse; that there was no confirmation that either child suffered from a failure to thrive; and that although there had been an allegation that the father had left pornographic material in his home in Oklahoma, there was no confirmation that the material contained child pornography, as initially suspected.
Rebecca Parris, the DHR social worker, testified that, based on the individualized service plan ("ISP"), the parents were required to maintain adequate housing; the mother was to remain employed; and the father was to gain employment. According to the ISP update prepared on March 16, 2000, the mother and father's strengths were listed as having friends and family for support; having been together for four years; that the mother could provide medical insurance through her employment; and that both parents cared about the children. She stated that there had been no history of physical abuse; that the parents had never tested positive for drug use; that they had visited the children on a consistent basis and had sought increased hours of visitation; and that when she had visited their residence, the utilities were on and there were no safety hazards. Her concerns were that the father had had numerous jobs and periods of unemployment; that there was a problem with hygiene because the parents "often smelled"; and that she did not think they interacted enough with the children during the supervised visits. She stated that she thought they had brought "inappropriate toys," based on the children's ages, such as a matchbox-car set, that one of the children had choked on a coin, which they suspected the father had given the child, that they had shared a soda when all of them had colds, and that the parents had been argumentative with one another during one visit.
Angela Morgan supervised the parents' visits from November 1999 through March 2000. She stated that the mother walked from her job and the father often caught a ride because they did not have transportation; that the mother had never missed a visit and that the father had missed only two; that she thought they had poor hygiene, but that they were probably coming directly from work. She stated that they brought meals for the children; that there was no behavior that showed neglect or unconcern for the children; however, on one occasion, she said, she saw the mother lick the child in the face.
Thomas Van Dyke, formerly employed with the Family Services Center, testified that he worked with the parents for about two to three months on issues involving budgeting and job skills for the father. He stated that the mother followed directions to organize the families bills and improved in budgeting their money; that she was working at a Taco Bell restaurant and appeared motivated to provide for her family; and that the father was seeking employment. He stated that the father sometimes was not as motivated as he thought appropriate, but that he did seek gainful employment; that the parents' residence was clean and tidy; and that they had reduced their expenses, as requested.
The mother testified that at the time of the hearing, she was employed at Taco Bell and had been working there since March 1999. She stated that she had been fired from a Waffle House restaurant after money was missing from the register; however, she said, the money was later recovered. She stated that she and the father had sought counseling through the local mental health center and had completed parenting classes after it was suggested in their ISP as a goal toward *Page 689 
reunification. She stated that they were current in their rent and utilities, and she identified photographs which she had taken showing the condition of their current residence. She admitted that she had been arrested for shoplifting a key chain from a local store. She began to testify on her heritage as a Chickasaw Indian; however, the trial court sustained an objection made on the basis that her heritage was irrelevant to the proceeding.
The father testified that they had lived at their present address for the past six months and had been renting from the same landlord for the past year. He stated that he had been employed with Washington Inventory for the past four months, earning approximately $6.50 per hour, and that he usually worked several days per week. He stated that many of his jobs had been through temporary employment agencies and that he suffered from chronic bronchitis and had problems with congestion and heat. He stated that they had been evicted on two occasions because they had been unable to pay their rent and that, although they had been investigated in Tennessee and Oklahoma, they had never had their children removed from their custody. He described the pornographic magazine "Family Fun," which he said was given to him as a gag gift, as sexual acts between consenting adults who were related to one another and that he did not think it proper for the previous landlord to give the book to a social-services agency after he had moved from the residence. When questioned by the court on his views about incest, he stated that he personally did not believe in it, but that the book was not illegal. He further stated that he thought child pornography was wrong and illegal. He stated that he agreed with DHR's assessment that he had been sporadic in his employment history; however, he disputed its allegations of sexual abuse, neglect, and inadequate supervision. He stated that he had provided several relatives as family resources; however, DHR had determined each relative to be unsuitable. He stated that DHR had not provided assistance in finding suitable housing and that they had located housing on their own. He admitted that he had been arrested for breaking and entering, after he entered a trailer he said he had thought was abandoned. He stated that DHR initially came to their residence to investigate a complaint and returned within the week to remove the children and that DHR removed them without interviewing him.
Dr. David Wilson, a psychologist, evaluated both parents for the court. He described the father as being sad about missing his children; he said that there was no indication of any severe psychopathology; and he said that the father had an above-average verbal intelligence and a fairly high IQ. He stated that the father had good reasoning skills and that they discussed the pornographic magazine, which, he said, the father described as a gag gift. Dr. Wilson described the mother as being limited in her ability to understand some of the questions, but he said that her test scores were generally good. He stated that she appeared impulsive and a little tense and frustrated over the custody situation. He stated that he also discussed the pornographic magazine with the mother, and that she stated that she knew it had been in the father's possession and that it had been left behind in their old residence because he did not have an interest in it.
Roslyn Lawson, the director of Concern for Children, testified that the parents had successfully completed that agency's six-week parenting program. She stated that she was impressed that the parents had walked to the classes because they did not have transportation; that they had been cooperative; and that they had improved *Page 690 
their appearance and hygiene after she spoke with them about it. She stated that they needed to learn how to ask for assistance in locating resources and that she had assisted them in completing an application for public housing.
After thoroughly reviewing the record, we conclude that the evidence did not support the termination of the mother and father's parental rights. The testimony by the DHR caseworkers indicated that the parents were not guilty of neglect or abuse; that they had maintained consistent communication and contact with the children; and that they had attempted to obtain additional services to regain custody of their children. Although the mother's arrest for shoplifting and the father's arrest for entering a trailer he thought was abandoned are signs of poor judgment, they do not rise to the level of grounds for terminating their parental rights. There was no testimony or evidence indicating that the father had inappropriate sexual tendencies, other than having a pornographic magazine, which he stated had been a gag gift. At the time of the hearing, both parents were employed, had stable housing, had completed parenting classes, and had been evaluated by a psychologist, who did not express any concern about their ability to parent their children. Based on the evidence, we reverse the trial court's judgment terminating the mother and father's parental rights and remand the case for an order consistent with this opinion. V.M. v. State Dep't of Human Res.,710 So.2d 915 (Ala.Civ.App. 1998).
Because this State has little caselaw regarding the applicability of the ICWA, we address the mother and father's argument regarding its applicability to this proceeding. The Act states, in part,
"§ 1901. Congressional findings:
 "Recognizing the special relationship between the United States and the Indian tribes and their members and the Federal responsibility to Indian people, the Congress finds —
". . . .
 "(3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;
 (4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and
 "(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families."
"§ 1902. Congressional declaration of policy
 "The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." *Page 691 
 "§ 1911. Indian tribe jurisdiction over Indian child custody proceedings
". . . .
 "(b) Transfer of proceedings; declination by tribal court. In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: Provided, that such transfer shall be subject to declination by the tribal court of such tribe.
 "(c) State court proceedings; intervention. In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding."
"§ 1912. Pending court proceedings
 "(a) Notice; time for commencement of proceedings; additional time for preparation. In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental right to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: Provided, That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding.
". . . .
 "(d) Remedial services and rehabilitative programs; preventive measures. Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.
". . . .
 "(f) Parental rights termination orders; evidence; determination of damage to child. No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."
In R.B. v. State Department of Human Resources, 669 So.2d 187
(Ala.Civ.App. 1995), we held that the parents in a termination-of-parental-rights proceeding could not raise an issue regarding the denial of the tribe's motion to intervene because the tribe had not appealed the trial court's judgment. Likewise, we agree that *Page 692 
the parents may not raise that issue on behalf of the tribe on appeal. We note, however, that it appears, from 25 U.S.C.A. § 1911(c), that the trial court erred in ruling that the motion was untimely. We further stated in R.B., supra that "the lack of subject matter jurisdiction may be raised an any time, however, by any party or by the court before which the case is tried or to which an appeal has been taken." Id. at 189. We held that the ICWA did not divest the state courts of their jurisdiction over children of Indian descent who do not live on a reservation; therefore, the Act did not preempt the state-court proceedings. Id.
The mother and father also argue that DHR failed to provide adequate notice to the tribe regarding the petition to terminate parental rights. Although there was conflicting testimony regarding a notification that DHR sent in 1998 regarding a dependency petition, there was no evidence that DHR notified the Indian tribe of the petition to terminate parental rights, as required under § 1912. See In the Interest of J.W.,498 N.W.2d 417 (Iowa App. 1993) (notice of a petition to terminate parental rights allegedly mailed to Omaha Tribe was insufficient to comply with the notification requirements of the ICWA.) In addition, the mother and father argue that DHR failed to meet the "beyond-a-reasonable-doubt" standard of proof and failed to present evidence, including expert testimony, indicating that returning the children to the parents would "likely . . . result in serious emotional or physical damage" to the children, as required under § 1912. We agree.
The State argues that the ICWA did not apply to this proceeding, because of the "exception" cited in S.A. v. E.J.P., 571 So.2d 1187
(Ala.Civ.App. 1990). In that case, this court held that the ICWA did not apply to a custody proceeding involving an illegitimate child born to a non-Indian mother and a father who was one-eighth Indian, where the father had had minimal contacts with the child and the child had never been exposed to Indian culture. This court stated, in part:
 "The ICWA operates where an Indian child is the subject of a child custody proceeding. . . . The ICWA defines `Indian child' as an unmarried person less than eighteen years old who is either a member of, or is eligible for membership in, an Indian tribe. If the threshold requirements are met, the provisions of the ICWA are applicable.
 "A number of jurisdictions, however, have created an exception to the applicability of the ICWA even in situations where the threshold requirements have been met. The `Existing Indian Family' exception has been applied to those fact situations involving the voluntary relinquishment of an illegitimate Indian child by its non-Indian mother."
Id. at 1189. We conclude that the facts in this case do not warrant an exception to the ICWA; therefore, the trial court erred in disallowing the mother's testimony regarding her Indian heritage and in determining the applicability of the ICWA. The court stated, "It doesn't have any relevancy as far as I'm concerned. It's irrelevant. It's a human being sitting in front of me, mother of the children." Under25 U.S.C.A. § 1914, the mother and father have the right to "petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of section 101, 102, and 103 of this Act [25 U.S.C. § 1911, 1912, and 1913]." We hold that in child-custody proceedings involving an "Indian child," as that term is defined in the ICWA, a state court must strictly construe and apply the provisions of the Act. *Page 693 
The judgment is reversed and the case is remanded for the trial court to enter an order consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
Crawley and Pittman, JJ., concur.
Thompson and Murdock, JJ., concur in the result.