Following an ore tenus proceeding held on October 23, 2002, the Conecuh Juvenile Court ("the trial court") terminated the parental rights of B.G. ("the mother") with regard to her two minor children. The trial court also terminated the parental rights of C.A., the father of the two minor children. Only the mother appeals.
In 2001, the mother and her two minor children were evicted from public housing *Page 306 
because the mother had allowed her brother to live with the mother and the children in violation of the public housing authority's rules. Because she was homeless, the mother requested that the Department of Human Resources ("DHR") place her children with their paternal grandmother. Relative placement was explored without success by DHR; subsequently, the children were placed in foster care.
On September 6, 2002, DHR filed a petition to terminate the mother's parental rights. The petition alleged that the mother had abandoned the children for over six months preceding the filing of the petition. A hearing on the petition was held on October 23, 2002, during which Mary Sullivan, a social-service caseworker, testified for DHR.
Sullivan testified that DHR had offered counseling and parenting classes to the mother during the 16 months preceding the termination hearing. Sullivan also testified that DHR had arranged for weekly family visits with the children and had provided transportation for the mother to the visitation. While the children were in DHR's custody, the mother was incarcerated on three separate occasions in Clarke, Conecuh, and Escambia counties. Two of the incarcerations were because the mother was found guilty of shoplifting, and one was due to the mother's failure to pay child support; each of those offenses was a misdemeanor. Before the termination hearing, the mother had served all of her time in jail and was working and living in Evergreen.
Sullivan testified that, except during the times when the mother was incarcerated and one other time when the mother was working, the mother had not missed a visit with her children. Sullivan stated that the mother brought small gifts to the children and that she lived in a mobile home that was "nice." Sullivan said that the mother paid child support and that she had no knowledge of the mother having any drug or alcohol problems.
At the time of the termination hearing, the mother had been employed for three months at South Forty restaurant. She was living in a mobile home with O.C. ("the boyfriend"), a married man separated from his wife. Sullivan expressed concern with the mother's living arrangement because the rent on the mobile home was paid by the boyfriend. Sullivan feared that the mother and the boyfriend might argue and that the boyfriend could force the mother to leave the mobile home, thus leaving the mother and the children homeless again. Sullivan felt that any living arrangement involving the boyfriend could be volatile because the boyfriend was still married.
Sullivan said that DHR might have felt differently regarding whether to seek the termination of the mother's parental rights if the mother had been living by herself in a more stable arrangement. Sullivan said that she never explicitly told the mother to move out of the mobile home that she was sharing with the boyfriend; however, she did state that she told the mother that DHR viewed the mother's current living conditions as unstable. Sullivan admitted that DHR did not help the mother find another place to live or tell the mother that she needed to move out and get her own place to live; Sullivan testified that, "I never advised [the mother] to do that. Where she lives is her choice." The mother testified that she believed she had done everything that DHR had asked her to do.
When asked whether she thought the mother could take care of the children, Sullivan testified that "as long as it was going to be a stable home . . . she probably could." Sullivan explained that a "stable home" would be one in which the mother lived by herself. Sullivan admitted that the mother had made improvements during *Page 307 
the time that the children had been in foster care, but she stated that the mother had taken too long to improve her situation. At the time of the termination hearing, the children had been in foster care for almost 17 months.
"The termination of parental rights is a drastic measure, and the courts gravely consider such action." K.A.C. v. Jefferson County Dep't ofHuman Res., 744 So.2d 938, 940 (Ala.Civ.App. 1999) (citing Ex parteBeasley, 564 So.2d 950 (Ala. 1990)). A parent's right to custody of his or her child may be overcome by clear and convincing evidence indicating that a termination of parental rights is in the best interests of the child. M.H.S. v. State Dep't of Human Res., 636 So.2d 419 (Ala.Civ.App. 1994).
Where a nonparent petitions to terminate a parent's parental rights, the trial court must apply a two-part test. Ex parte Beasley, 564 So.2d at 952. First, the trial court must determine that the child is dependent. After finding the child dependent, the court must examine viable alternatives to the termination of parental rights. Where a trial court hears evidence ore tenus, its judgment is presumed to be correct; that judgment will be set aside only if the record reveals it to be plainly wrong. Varner v. Varner, 662 So.2d 273 (Ala.Civ.App. 1994).
The mother argues that the trial court did not have before it clear and convincing evidence that no viable alternative to the termination of her parental rights existed. Section 26-18-7, Ala. Code 1975, which provides the statutory authority for the termination of parental rights, provides:
 "(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
 "(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
 "(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
 "(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
 "(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
 "(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care *Page 308 
agencies leading toward the rehabilitation of the parents have failed.
 "(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
". . . .
 "(8) That parental rights to a sibling of the child have been involuntarily terminated.
 "(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
 "(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
 "(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
 "(3) Failure by the parents to maintain consistent contact or communication with the child.
 "(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached by local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
The mother certainly has been far from the ideal parent. She has made numerous bad decisions in her life. However, according to DHR's own assessment, the mother has made a great deal of progress. The record shows that at the time of the termination hearing, the mother had served her jail time, found employment, completed two parenting classes, attended counseling, continued making child-support payments, and found a place to live that Sullivan described as a "nice, neat and clean home." The mother also had continued weekly visitation with her children and had brought them gifts. The mother did not drink any alcohol or use any illegal drugs. According to Sullivan, the only part of the mother's life that DHR viewed as "unstable" was the mother's living situation with the boyfriend. Although arguably the mother should have been able to recognize the problem with her living arrangement, DHR never clearly explained to the mother that it was her living with the boyfriend that was keeping her children from being returned to her. Sullivan testified that after children have been in DHR's custody for one year the State begins to seek the termination of parental rights pursuant to state policy.
The termination of parental rights is reserved for the most egregious of circumstances. Ex parte Beasley, supra. Given the facts of this case, we cannot say that the evidence in support of DHR's petition in this case was "so `clear and convincing' as to support `the last and most extreme disposition permitted by law, the termination of parental rights.'" T.H.v. State Dep't of Human Res., 740 So.2d 1089, 1092 (Ala.Civ.App. 1998) (quoting Bowman v. State Dep't of Human Res., 534 So.2d 304, 306
(Ala.Civ.App. 1988)). While we are aware of the legal principles that control a parental-rights-termination case and of the presumption accorded a trial court's judgment when it has heard evidence ore tenus, after reviewing the record in this case, we must conclude that the decision of the trial court to terminate the mother's parental rights, at least at this point, is not supported by the evidence. Therefore, we conclude that the trial court's decision to terminate the *Page 309 
mother's parental rights was premature. See K.A.C. v. Jefferson CountyDep't of Human Res., 744 So.2d 938 (Ala.Civ.App. 1999); see alsoL.A.G. v. State Dep't of Human Res., 681 So.2d 596 (Ala.Civ.App. 1996).
REVERSED.
YATES, P.J., and CRAWLEY, J., concur.
PITTMAN and MURDOCK, JJ., concur in the result.