W.P. appeals a judgment terminating his parental rights regarding C.R. ("the child"). We reverse and remand.
On September 9, 2005, the Madison County Department of Human Resources ("DHR") petitioned to terminate the parental rights of S.G. ("the mother") and W.P. regarding the child. After holding ore tenus proceedings, the juvenile court found the child dependent and awarded DHR custody of the child. The juvenile court then held ore tenus hearings regarding DHR's petition on November 14, 2005, May 16, 2006, and October 27, 2006. At the end of the October 27, 2006, ore tenus proceeding, the juvenile court rendered an oral judgment terminating the mother's and W.P.'s parental rights regarding the child. After the juvenile court rendered its oral judgment, DHR's attorney stated that adoption by the child's foster parents was DHR's recommended permanency plan. The juvenile court adopted that plan. Making specific findings of fact, the juvenile court then entered a written judgment on November 3, 2006, terminating the mother's and W.P.'s parental rights regarding the child. W.P. then timely appealed.[1]
The mother gave birth to the child, a girl, on April 13, 2004. DHR first became involved with the child when it received a report during the time the mother was hospitalized after giving birth to the child. Melanie Baxter, a DHR social worker, investigated the mother and had the child removed from the mother's custody when she received a report alleging, among other things, that the child's alleged father, J.R., had been seen purchasing and using cocaine. Baxter also based her decision to remove the child from the mother's custody on her conclusion that the mother's schizophrenia and her refusal to take her medication rendered her unable to provide adequate care for the child.
J.R. was listed as the biological father of the child on the child's birth certificate. However, the mother later suggested to DHR officials that W.P. was possibly the biological father of the child. DHR officials notified W.P., and he subsequently requested and submitted to a paternity test. The results of that test established that W.P. was the biological father of the child, and the juvenile court adjudicated W.P. as the child's father on December 2, 2004. (W.P. is hereinafter referred to as "the father.") The juvenile court then ordered the mother and the father to complete child-support affidavits and to pay child support in accordance with Rule 32, Ala. R. Jud. Admin.
The father testified that he had contacted all the child's social workers and the child's guardian ad litem inquiring as to his child-support obligation. The father introduced a letter from DHR indicating *Page 1018 
that the father had submitted the requisite child-support affidavits. That letter also stated that the guardian ad litem would calculate the father's child-support obligation and that the guardian ad litem would contact the father regarding his obligation. The father also testified that he had tendered money for the child to a social worker; however, that social worker returned that check. The evidence indicates that when the father inquired regarding the child's needs, a social worker requested that the father purchase a car seat for the child; after the father purchased the car seat, a social worker notified the father that all the child's other needs had been fulfilled.
Angela Lehofer Jones, a caseworker at DHR, testified that DHR had two concurrent permanency plans for the child at the time she was assigned the case in late January or early February 2005. She stated that the first plan was oriented toward reunifying the child with the father and that the second plan was fashioned toward adoption of the child by her foster parents. Jones testified that, in May 2005, the father told Jones that he wanted to voluntarily "delegate" his parental rights to the foster parents and that he wanted the foster parents to adopt the child because, she testified, the father stated that he was overwhelmed. Jones testified that the father changed his mind regarding his desire to voluntarily "delegate" his parental rights to the foster parents shortly thereafter. Jones testified that the permanency plan changed solely to adoption by the foster parents based, in part, on the juvenile court's finding that the father was not a "viable placement" for the child based on the evidence presented at a hearing in June 2005.
Carol Nixon, a juvenile-dependency case investigator for the juvenile court, conducted a home study of the father's home in April 2005. The home-study report indicated that the father lived in a three-bedroom apartment in public housing and that he had been residing in that apartment for four years. The father's daughter, A.P., born in March 2000, has resided with him since the time of her birth.[2]
At the time Nixon conducted the home study, the father was married but had been estranged from his wife since 1999. The father stated that he has not sued her for a divorce because, he says, he could not afford such a lawsuit and his wife would contest a divorce.
The father also testified that H.B. had resided with him for two years until a few months before the October 27, 2006, hearing. H.B. is the mother of two of his children, V.P. and Je., ages 11 months and 20 months, respectively, at the time of the October 27, 2006, hearing. When questioned by DHR social workers, the father denied that he was in a romantic relationship with H.B. and that he was the father of V.P.
Jones testified that her efforts were thwarted, in part, because of the father's lack of candor regarding his relationship with H.B. and his having fathered V.P. by H.B. because, she testified, it is DHR's policy to investigate everyone who has caregiving responsibilities. Additionally, Jones testified that knowledge of the father's relationship with H.B. is also pertinent because of DHR's concerns regarding the father's past criminal history of domestic violence.
At the time of the October 27, 2006, hearing, the father stated that H.B. no longer resided with him. However, they "share" custody of V.P. and Je.; the father picks up V.P. and Je. from day care and *Page 1019 
cares for them until H.B. retrieves V.P. and Je. from the father.
Nixon testified that the father and A.P. have a very good relationship and that the father does well in establishing boundaries for A.P. In Nixon's home-study report, she noted that the father's strengths included having good references, being a very good father to A.P., maintaining a clean home for A.P., and exhibiting no signs of substance abuse. The father testified that his involvement with A.P.'s education includes attending parent-teacher conferences and observing A.P.'s classes. In addition, the juvenile court requested that DHK investigate Je. and A.P. during the time they were residing with the father. DHK's attorney stipulated at trial that no circumstances warranted the removal of those children from the father's custody.
While this action was pending, the father had been enrolled at a community college and had been accepted into a nursing program at a four-year university. The father had been elected vice president of the student government association at his community college and had received a stipend for that position. At the time of the October 27, 2006, hearing, the father was no longer enrolled at the community college and was working as a waiter earning between $300 and $400 each week. The father receives assistance for food for himself and for A.P. The father testified that he plans to reenroll in college sometime in the future.
The evidence established that the father has a criminal history. In June 2001, the father and his previous girlfriend, C.K., were arrested for shoplifting while C.K's son, J., accompanied them. The Lauder-dale County Department of Human Resources obtained custody of J. The evidence also established that the father had been arrested and convicted for shoplifting arising out of an incident that occurred in April 2003 while A.P. was with him. Additionally, the father admitted that he had a shoplifting charge pending at the time of the trial in this action arising out of an incident that occurred in August 2006.
Additionally, the father had been convicted of assault and harassment for committing various acts of domestic violence against C.K. between August and October 2000. The father testified that he had pleaded guilty to charges arising from two incidents involving acts of domestic violence. As a result of those convictions, the father had been sentenced to five days' imprisonment for harassment in the third degree; however, that sentence had been suspended and the father had been released on probation. Also, the father had been sentenced to 40 days' imprisonment for assault in the third degree. The father had served two days of the 40-day sentence and had been released on probation. However, the father had violated the terms of his probation and was required to serve the remaining 38 days. The father also had been convicted of reckless endangerment. He had been sentenced to 40 days' imprisonment regarding that conviction. The father had served the reckless-endangerment sentence concurrently with the remaining 38-day assault sentence. The evidence also established that C.K. had been arrested for harassing the father. The father also admitted that he had been involved in domestic disputes with H.B. However, the father denied that he had physically assaulted H.B., and he testified that incidents involving H.B. had not escalated beyond oral arguments.
The father's reckless-endangerment conviction arose out of an incident that occurred in September 2001. The father left J. and A.P. in his vehicle while he tended to matters pertaining to his parole inside a municipal building. The father testified that he understood that he had exercised *Page 1020 
poor judgment in leaving those children unattended in the vehicle.
Additionally, the father admitted that he had been arrested for promoting prostitution in 1995. The father testified that that charge had been dismissed and expunged from his record.
The evidence established that the father had completed a 12- to 13-week anger-management course with Dr. Danny Blanchard. Nixon testified that Dr. Blanchard's comments regarding the father were positive and that Dr. Blanchard supported the father's efforts to gain custody of the child. However, Nixon stated that the father's shoplifting with J., and his leaving J. and A.P. in his vehicle alone, indicated to her that the father lacks good judgment. Nixon also reported that, at the time of her home-study report, DHR had not provided the father with any services since the father had become involved with DHR. In her home-study report, Nixon recommended that the father participate in parenting classes and submit to a psychological evaluation.
In April 2005, the same month that Nixon conducted the home study, the father completed a psychological evaluation conducted by Dr. Gail Gibson. The father submitted to two parenting-skills assessments. One test result was invalid because that test indicated that the father was not communicating truthfully. The other test indicated that the father's parenting skills were average to above average. Furthermore, Dr. Gibson opined that the father had a low probability of substance abuse. Dr. Gibson also reported that the father has an intellectual functioning that is most likely in the superior range. However, she recommended that DHR proceed with caution in reuniting the father and the child because she believed that the father and the child had not had time to bond. She also recommended that the father obtain individual counseling. According to Dr. Gibson, reunification should be considered once the father obtained counseling, stable employment, and a stable financial condition.
DHR then offered the father counseling services. However, upon the father's request, Jones agreed to allow the father to find his own counselor. Jones testified that she did not know whether the father had obtained counseling. The child's case was then transferred to December Gibson ("December") in July 2005.
At the time December became the child's DHR social worker, the permanency plan was changed to termination of the father's parental rights. However, December testified that DHR maintained an obligation to provide the father reunification services. December stated that she referred the father to counseling in August 2005 because, she said, it was recommended by Dr. Gibson and it was a goal stated in the father's individual service plan ("ISP"). December testified that the father had requested that he obtain his own counselor and that she had agreed on the condition that officials at DHR first consult with the counselor before the father's attendance. After December's repeated requests that the father obtain counseling, the father sought counseling from Dr. Rocco Petrella in November 2005.
Dr. Petrella conducted a psychological evaluation and authored a report indicating that the father is "stable and well balanced." He also testified that he did not see any hindrances to the father's ability to parent. However, he testified that he was not asked to conduct nor did he conduct a parental assessment of the father. Rather, Dr. Petrella evaluated the father for the sole purpose of determining the father's suitability to enroll in a nursing program. *Page 1021 
December testified that the father had failed to consult her before he obtained counseling from Dr. Petrella. Moreover, December also testified that the father had repeatedly stated that, based on Dr. Petrella's evaluation, he did not need counseling. According to December, the father continued to insist that he did not need to obtain counseling when she inquired three weeks before the May 16, 2006, hearing.
The evidence established that the father regularly attended ISP meetings and regularly exercised visitation with the child. December's testimony established that the father's visits were consistent and that he had missed visitation on only a few occasions. The evidence also established that the father had requested additional visitation with the child.
On appeal, the father argues that insufficient evidence supports the juvenile court's judgment terminating his parental rights. We agree.
"`In ore tenus proceedings, the trial court is the sole judge of the facts and of the credibility of the witnesses, and it should accept only that testimony which it considers worthy of belief.' demons v. Clemons, 627 So.2d 431, 434
(Ala.Civ.App. 1993)." Ex parte R.E.C., 899 So.2d 272,279 (Ala. 2004). Also,
 "`[t]he ore tenus rule provides that a trial court's findings of fact based on oral testimony "have the effect of a jury's verdict," and that "[a] judgment, grounded on such findings, is accorded, on appeal, a presumption of correctness which will not be disturbed unless plainly erroneous or manifestly unjust." No-land Co. v. Southern Dev. Co., 445 So.2d 266, 268 (Ala. 1984).'"
Ex parte R.E.C., 899 So.2d at 279.
 "However, even under the ore tenus rule, `[w]here the conclusion of the trial court is so opposed to the weight of the evidence that the variable factor of witness demeanor could not reasonably substantiate it, then the conclusion is clearly erroneous and must be reversed.' Jacoby v. Bell, 370 So.2d 278, 280
(Ala. 1979). See also, P.A.T. v. K.T.G., [749] So.2d [454, 456] (Ala.Civ.App. 1999)."
B.J.N. v. P.D., 742 So.2d 1270, 1274
(Ala.Civ.App. 1999).
We are ever mindful that "[t]he termination of parental rights is a drastic measure, and the courts gravely consider such action." K.A.C. v. Jefferson County Dep't of HumanRes., 744 So.2d 938, 940 (Ala.Civ.App. 1999) (citing Exparte Beasley, 564 So.2d 950 (Ala. 1990)). Furthermore, "[t]he termination of parental rights is reserved for the most egregious of circumstances." B.G. v. State Dep't of HumanRes., 875 So.2d 305, 308 (Ala.Civ.App. 2003).
In Ex parte Beasley, 564 So.2d 950, 954 (Ala. 1990), our supreme court stated:
 "The two-prong test that a court must apply in a parental rights termination case brought by a custodial parent consists of the following: First, the court must find that there are grounds for the termination of parental rights, including, but not limited to, those specifically set forth in § 26-18-7[, Ala. Code 1975]. Second, after the court has found that there exist grounds to order the termination of parental rights, the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered. (. . . [I]f a non-parent, including the State, is the petitioner, then such a petitioner must meet the further threshold proof of dependency.)"
Section 26-18-7, Ala. Code 1975, provides:
 "(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents *Page 1022 
of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
 "(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
 "(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
 "(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
 "(4) Conviction of and imprisonment for a felony.
 "(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
 "(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
 "(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
 "a. Murder or voluntary manslaughter of another child of that parent.
 "b. Aiding, abetting, attempting, conspiring, or soliciting to commit murder or voluntary manslaughter of another child of that parent.
 "c. A felony assault or abuse which results in serious bodily injury to the surviving child or another child of that parent. The term `serious bodily injury' means bodily injury which involves substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.
 "(8) That parental rights to a sibling of the child have been involuntarily terminated.
"(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
 "(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
 "(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent. *Page 1023 
 "(3) Failure by the parents to maintain consistent contact or communication with the child.
 "(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.
"(c) In any case where the parents have abandoned a child and such abandonment continues for a period of four months next preceding the filing of the petition, such facts shall constitute a rebuttable presumption that the parents are unable or unwilling to act as parents. Nothing in this subsection is intended to prevent the filing of a petition in an abandonment case prior to the end of the four-month period."
(Emphasis added.)
"Clear and convincing evidence" is "`[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'" L.M. v. D.D.F.,840 So.2d 171, 179 (Ala.Civ.App. 2002) (quoting § 6-11-20(b)(4), Ala. Code 1975). We are cognizant that, as an appellate court, we cannot reweigh the evidence. However, as an appellate court, we must determine whether clear and convincingevidence supports the juvenile court's conclusion that grounds exist warranting the termination of a parent's parental rights. See § 26-18-7.
The juvenile court found relevant the father's criminal convictions for shoplifting. We do not condone the father's illegal behavior; however, those shoplifting convictions, which were not established as felony convictions, do not rise to the level that warrants termination of the father's parental rights. See S.H. v. Calhoun County Dep't of HumanRes., 798 So.2d 684, 690 (Ala.Civ.App. 2001) (concluding that the evidence of the mother's arrest for shoplifting and the father's arrest for breaking and entering was insufficient, considering their efforts to adjust their circumstances, to warrant termination of their parental rights). Furthermore, the evidence established that the father had pleaded guilty to committing acts of domestic violence against C.K. However, the evidence established that those acts had occurred in the latter part of 2000 — nearly four years before the birth of the child. Moreover, the father has completed an anger-management course to address his domestic-violence issues. Furthermore, there is no evidence indicating that the father had committed acts of domestic violence against H.B., who had resided with him for two years.
Regarding a parent's ability to discharge his or her responsibilities, this court has previously stated:
 "`[P]ast history, as well as present circumstances, may properly be considered by the court in a termination proceeding. Fitzgerald v. Fitzgerald, 490 So.2d 4 (Ala.Civ.App. 1986). Still further, [a parent's] success or lack thereof in raising [that parent's] other child[ren] is a factor for the court to consider in determining whether the evidence supports the termination of parental rights. Hayes v. State Dep't of Human Res., 563 So.2d 1035 (Ala.Civ.App. 1990).'"
S.B.L. v. Cleburne County Dep't of Human Res.,881 So.2d 1029, 1032 (Ala.Civ.App. 2003) (quoting J.R. v.D.A.M., 615 So.2d 609, 612 (Ala.Civ.App. 1992)). The evidence established that the father had been convicted of reckless endangerment *Page 1024 
by leaving A.P. and J. in a car while he tended to matters pertaining to his parole inside a municipal building; however, the father testified that he understood that he had exercised poor judgment regarding that incident. Moreover, the father's psychological evaluation, conducted by Dr. Gibson, indicated that the father has average to above-average parenting abilities. Additionally, DHR's investigation of A.P. and Je. disclosed no circumstances that warranted the removal of those children from the father's custody. Moreover, Nixon's testimony established that the father was a very good father to A.P. and that he was adequately providing for her needs.
We acknowledge that the father is not a model parent. However, the evidence established that the father has not only regularly visited the child, with the exception of a few missed visitations, but has requested additional visitation; that the father regularly attended ISP meetings; that the father inquired regarding the child's needs and proactively sought to pay child support; and that the father obtained steady employment, maintained stable housing for four years, and raised A.P. and, by all accounts, is a good parent to her.
We are mindful that an appellate court cannot reweigh the evidence. However, we must determine whether clear and convincing evidence supports the juvenile court's decision to terminate that father parental rights. See L.M. v.D.D.F., 840 So.2d at 179. We conclude that, in this case, clear and convincing evidence does not support the judgment terminating the father's parental rights. Id. See alsoB.J.N., supra. Accordingly, we reverse the judgment terminating the father's parental rights regarding the child, and we remand the case for the entry of a judgment consistent with this opinion. We pretermit a discussion of the father's remaining arguments on appeal.
REVERSED AND REMANDED.
THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, JJ., concur.
[1] The mother does not appeal the judgment terminating her parental rights.
[2] The father has a total of four children, A.P., C.R., Je., and V.P., by three different women.