681 So.2d 596 (1996)
L. A. G.
v.
STATE DEPARTMENT OF HUMAN RESOURCES.
2950433.
Court of Civil Appeals of Alabama.
August 9, 1996.
*597 Diane Haden Henderson, Winfield, for Appellant.
William Prendergast and Lynn Sensabaugh Merrill, Asst. Attys. Gen., for Appellee.
YATES, Judge.
This case involves the termination of parental rights of the mother, L.A.G., as to her son, P.D.G. On November 22, 1989, the Lamar County Department of Human Resources (DHR) petitioned the juvenile court, requesting temporary custody of P.D.G., born March 7, 1989. DHR alleged that P.D.G. had been physically, mentally, or emotionally abused by his parents; that he was without the proper parental care and control necessary for his well-being; and that his parents were either unable or unwilling to provide the proper parental care and control. Following an ore tenus proceeding, the court granted DHR's petition. Over the next five years, reports were filed with the court and dispositional hearings were held regarding the ongoing status of this case. P.D.G. has lived in two foster homes since being in the custody of DHR.
On October 6, 1995, DHR petitioned for the termination of parental rights of the mother, stating that the father of P.D.G. is unknown. Following an ore tenus proceeding, the court, on December 29, 1995, terminated the mother's parental rights, finding: that P.D.G. is a dependent child; that the mother "has not made sufficient efforts to adjust her circumstances to meet the needs of [P.D.G.]"; and that there are no viable alternatives to the termination of parental rights. The mother appeals.
At the time of the hearing, P.D.G. was seven years old; he had been in foster care since he was approximately eight months old. P.D.G. is a "special needs" child, suffering from "severe microcephaly," which is associated with small stature and weight. He has severe bowel problems and is not toilet trained. He has delayed motor skills and poor muscle development, and is approximately one and one-half years behind in his development. P.D.G. had received physical, occupational, and speech therapy; however, his growth and development is not expected to rise to within the normal range. P.D.G. is suspected of suffering from some degree of mental retardation; however, he has not yet been tested, because his communication skills are too low to provide an accurate test. He requires close supervision, because he is prone to wander off and because he does not appear to feel pain; unless someone sees him injure himself or sees some external sign of injury, one would not know that he had been injured. P.D.G. receives SSI and Medicaid benefits based on his physical limitations.
*598 L.A.G. was 17 years old when P.D.G. was born; she was 24 years old at the time of the hearing. She is mildly retarded and receives SSI benefits. She requires a payee for her SSI check because she is unable to attend to her own financial affairs. L.A.G. has a ninth-grade education, is literate, can prepare meals, clean house, and wash clothes. She lives with her parents; her father is unemployed and her mother works. While her mother is at work, L.A.G. does the housework and prepares dinner every day for the family. She is unemployed; however, she occasionally babysits a 14-month-old child.
At the time of the initial proceedings in November 1989, the mother was married to D.P.G., who was serving a four-year prison sentence. D.P.G. advised DHR that the mother was pregnant when he married her, and that he was not P.D.G.'s biological father; this was confirmed by blood tests. Thereafter, the mother provided DHR with the name of another man that might be P.D.G.'s father; however, blood tests also excluded this man as the father. L.A.G. and D.P.G. have since divorced.
The trial court stated in its termination order that DHR had made "extensive efforts" to "train" the mother. We disagree.
We note that the ore tenus rule is applicable to cases involving the termination of parental rights; when evidence is received ore tenus, the judgment of the trial court is presumed to be correct and will be set aside only if the record shows the judgment to be plainly and palpably wrong. J.L.B. v. State Dep't of Human Resources, 608 So.2d 1367 (Ala.Civ.App.1992). Section 26-18-7(a), Ala. Code 1975, provides, "If the court finds from clear and convincing evidence, competent, material and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child ... it may terminate the parental rights of the parents." "A natural parent has a prima facie right to the custody of his child, unless it can be proven by clear and convincing evidence that permanent removal of the child from the parent's custody would serve the best interests of the child." T.M.S. v. Elmore County Dep't of Human Resources, 647 So.2d 746, 747 (Ala.Civ.App. 1994). The paramount concern of the court in these proceedings is the child's best interests. In determining the child's best interests, the court must consider whether the parents are physically, financially, and mentally able to provide for the child. G.D.M. v. State, 655 So.2d 1020 (Ala.Civ.App.1995). When the state seeks to terminate one's parental rights, the court must apply a two-pronged test. Ex parte Beasley, 564 So.2d 950 (Ala.1990). First, the court must find by clear and convincing evidence that the child is dependent; second, the court must consider and reject all alternatives to termination of parental rights. Id. The termination of one's parental rights is an extreme matter that is not considered lightly. G.D.M., supra. Once parental rights have been terminated, we know of no means by which those rights can be reinstated. K.M. v. Shelby County Dep't of Human Resources, 628 So.2d 812 (Ala.Civ.App.1993).
Cheryl Stone, a social worker for DHR, became involved in this case in November 1989. The record contains her first report of November 1991 to the court in which she states that L.A.G. and P.D.G. were enrolled in a program designed to teach the mother how to meet the needs of her son, but that her participation in the program was "a complete failure" because she was unable to accept instructions ... to help [P.D.G.] in his work at the [program]. The report also states that "[L.A.G.] is willing to do whatever it takes to get her child back" and that she "continues to work with our agency to do whatever is requested." Stone stated that DHR had attempted to develop the mother's parenting skills by allowing the mother to visit P.D.G. in his first foster home, where the foster mother would instruct L.A.G. on meeting P.D.G.'s basic needs, including proper feeding and bathing, when he was an infant. However, Stone admitted at the January 1996 hearing that L.A.G. had been allowed only one overnight visit with P.D.G. in the seven years that DHR had had custody of him. She further admitted that structured parenting classes had not been offered to L.A.G. since 1990. Stone testified that she did not believe L.A.G. has the ability to care for P.D.G. and that L.A.G. had not been *599 given an opportunity to independently care for P.D.G. because, she said, "[W]e did not feel comfortable in leaving her with him because of her lack of skills on just supervising him." She further stated that L.A.G. had always had contact with P.D.G. and had never missed a visit with him. Stone's involvement in the case ended in June 1994 when Diane Turner, a social worker for DHR, became involved.
Turner testified, "[W]e don't have anything in our record that states what [L.A.G.'s] IQ is or anything, but usually when you receive SSI and it's just on your mental condition, it is because of your low IQ." She observed that during visits, L.A.G. is "interested in reading the books and playing with the toys as much as [P.D.G.] is." She said that she feels that that mental "condition" would prevent L.A.G. from learning the necessary supervision skills. However, when asked if L.A.G. would, if given repetitive classes, be able to learn some fundamental skills, Turner stated, "She might could learn some of these fundamental skills, but ... I don't know if she could ever be left with him completely unsupervised and care for him." She testified that, during the last 18 months, no efforts had been made to reunite the mother and P.D.G., and that before she was assigned the case in 1994, the decision had been made to seek termination of the mother's parental rights. Turner admitted, that since she has been involved with the case there had been no effort to teach L.A.G. any parenting skills; a home study had not been performed; and possible family resources had not been explored.
Sue Thomas, the second foster mother, has had P.D.G. in her home for the last three years. She testified that P.D.G. requires a lot of attention; that he has to wear diapers; and that she has to feed him, but that he is not on a special diet. Thomas stated that she takes P.D.G. to visit his mother every other week for approximately one and one-half hours. Although Thomas stated that she does not think that the mother could learn to care for P.D.G., she admitted that the visits did not involve the mother's feeding or bathing P.D.G.; that she does not know if the mother is capable of performing these tasks; and that the mother has changed P.D.G.'s diaper and is able to do that.
P.E., the maternal grandmother, testified that she works from 6:00 a.m. until 3:30 or 4:30 p.m., but that her husband, the maternal grandfather, assists an elderly man approximately only one to two hours per week and is otherwise at home during the day. She stated that both she and her husband were willing to assist L.A.G. in caring for P.D.G. She further stated that she is aware of P.D.G.'s problems and knows of no reason why he could not visit overnight or for a few days; that she knows of nothing in the home that would be unsafe for him; and that someone would be with L.A.G. to assist her if she needed assistance and to provide transportation. The only unsupervised visitation that L.A.G. and the grandmother have been allowed with the child was a one-day venture to have P.D.G.'s picture made.
Additionally, the grandmother testified that approximately two to three years ago, two of her sisters who live in Mississippi both expressed an interest in adopting P.D.G. The grandmother stated that Stone was aware of these two family members; however, Stone testified that she had never spoken with the two sisters about being a possible family resource.
L.A.G. testified that she was very young when P.D.G. was born and that she did some "foolish things" like taking him outside into the cold when she was not supposed to, but that she has matured and "understands more" now. She stated that she realizes that taking care of P.D.G. would require a lot of work, but that she wants "to try to learn how to take care of the child." She stated that when P.D.G. visits she plays with him and reads books to him. She quit school at the age of 16; she was in special education. L.A.G. testified that she recognizes that it takes her longer to learn things than it takes most people and that, although it would take her longer to learn to take care of P.D.G., she stated, "I would try, try my best." She said that she receives SSI benefits because of a "bowel problem" similar to that of her son.
In Wishinsky v. Department of Human Resources, 512 So.2d 122 (Ala.Civ.App.1987), a case with facts similar to those in the *600 present case, this court reversed the trial court's termination of a mother's parental rights. In Wishinsky the mother, who was borderline mentally retarded, had visited the child regularly; had attended parenting classes; had been consistent in expressing love for her child; and had made continuing efforts to be reunited with her child. We noted that although the mother did not possess an abundance of parenting skills, she had visited the child regularly and had made an effort to rehabilitate herself, and that there were others who had offered to provide regular assistance and supervision should the child be returned to the mother. Id., at 124.
The evidence indicates that the mother and P.D.G. love each other. The mother has had regularly scheduled visits with P.D.G. since he has been in foster care. She has cooperated and worked well with DHR and has otherwise shown a devoted interest in being reunited with P.D.G. We are keenly aware that P.D.G. is a special needs child and, as such, requires a great deal of supervision; however, we are also aware that, as a special needs child, it may be difficult for him to be placed in a permanent home setting.
We conclude that the termination of the mother's parental rights was premature; that it was not supported by the evidence; and that other viable, less drastic alternatives exist. Therefore, we reverse the judgment and remand the case. We suggest to the trial court that upon remand it order DHR: (1) to conduct a home study of L.A.G. and the maternal grandparents; (2) to provide structured parenting classes to L.A.G.; (3) to then allow, if feasible, overnight visitation with the mother in her home; (4) to investigate other possible family resources; and (5) to submit reports to the court for its further consideration and monitoring.
REVERSED AND REMANDED WITH INSTRUCTIONS.
CRAWLEY, J., concurs specially.
ROBERTSON, P.J., concurs in the result.
CRAWLEY, Judge, concurring specially.
I concur in the reversal on the grounds that the termination of the mother's parental rights was premature. However, I write this special concurring opinion to point out to DHR its misunderstanding of its duty to the trial court regarding evidence of alternatives to termination of parental rights.
In its brief, DHR argues that the trial court's judgment to terminate parental rights was correct because:
"Neither of these great-aunts had presented themselves to the court as alternatives for placement at any time during the six years this child was in care. They had expressed no interest in taking him in the three years since [the maternal grandmother] reportedly had these conversations with them. Considering [the child's] special needs, the high degree of care necessary to maintain his physical well-being and safety, as well as the great-aunts' failure to indicate any interest in the child or to offer themselves as placement resources at any time during the six years [the child] had been in foster care the trial court correctly determined that these relatives were not viable alternatives for placement which would serve [the child's] best interest."
(Last emphasis in original; all others added.)
DHR also argues:
"[The mother] was unable to meet his needs, and did not present a viable alternative for placement which would have served this child's best interests."
(Emphasis added.)
Section 26-18-7 lists the factors to be considered by a trial court in determining whether to terminate parental rights. Subparagraph (a)(6) states:
"That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed."
Subparagraph (a)(6) clearly puts the duty on DHR to make "reasonable efforts" to rehabilitate a parent. This court has stated:
"There is no indication in the record that DHR has done any further evaluation of the Wilson home since August 1985 or has explored the possibility of placing the children with other family members.

*601 "In order to establish that termination of parental rights is the least drastic alternative, DHR should present evidence to the court of recent attempts to locate viable alternatives. Consequently, we must reverse the trial court's order terminating the parental rights of [the parents], due to the fact that it was not established that all viable alternatives had been examined."
Wilson v. State Dep't of Human Resources, 527 So.2d 1322, 1324 (Ala.Civ.App.1988) (emphasis added) (citations omitted).
Judge Holmes's special concurrence in Wilson also stated:
"I agree with the majority that DHR should have introduced evidence regarding recent attempts to locate viable alternatives to termination of parental rights. I would add that I have searched the record in vain for any evidence as to the current inability or unwillingness on the part of the parents to properly care for their children, or any evidence relating to the present condition of their home and lifestyle. Without such evidence, any findings of the court regarding the unlikelihood of such conditions changing in the foreseeable future are meaningless.
"We have held that evidence of such current conditions or conduct relating to the parents' ability or willingness to care for their children is implicit in the requirement that termination of parental rights be based upon `clear and convincing' evidence. Hamilton v. State, 410 So.2d 64 (Ala.Civ. App.1982).
"In short, I do not think that DHR has met the burden of proving its case as required by statute. See Ala.Code (1975), § 26-18-7 (1986 Repl.Vol.)."
Wilson, 527 So.2d at 1325 (first and third emphasis added) (second emphasis in original).
DHR's attempt to shift the blame to the child's mother and family for failure to present evidence of a viable alternative is particularly troublesome in this case. The mother is receiving SSI checks for her mental limitations and is not in a position to conceive of alternatives.