This case involves the termination of the parental rights of the mother, S.B.L., as to her two minor children, C.D.B. and T.S.B. The children do not have the same father. Both fathers' parental rights were also terminated. On August 23, 2000, and August 1, 2001, respectively, the Cleburne County Department of Human Resources ("DHR") petitioned for permanent custody of both the children, who had been declared dependent by the court in November 1998.
After a permanency hearing on October 26, 2000, the court determined that continued placement in the mother's home would be contrary to the children's bests interests; that reasonable efforts had been made by DHR to prevent or eliminate the need for removal of the children from the home; and that reasonable efforts had also been made by DHR to reunite the children with their family and that those efforts had failed. Thus, the court decided that the most appropriate permanent plan was to pursue termination of parental rights. On July 31, 2001, the court denied the mother's request for relative placement; the court based its decision on testimony, exhibits, and the report of the guardian ad litem, which stated that relative placement would not be in the best interests of the children.
Following ore tenus proceedings on January 11, 2002, and April 24, 2002, the court, on August 26, 2002, terminated the parental rights of S.B.L. and the two fathers, and it awarded DHR permanent custody of the children. In its order, the court found that the fathers had shown no interest in the children's lives and had not participated in any attempt at reunification. It found that the mother had had a long history with DHR, during which she had been unstable and had suffered from alcohol addiction. Additionally, it determined that although the mother had displayed a short period of apparent stability her history indicated that she had not been capable or willing to demonstrate long-term stability. Last, the court found that the children had stabilized while in DHR's custody and that removing the children and placing them with the mother would risk causing permanent irreversible harm to the children. The mother appeals.
She first argues that the trial court abused its discretion in terminating her parental rights, alleging that "there was no substantial evidence that she was unable or unwilling to discharge her responsibilities to and for the children or that her conduct was such as to render her unable to properly care for the children and that such conduct or condition is unlikely to change in the foreseeable future." We disagree.
The termination of parental rights is governed by § 26-18-7(a), Ala. Code 1975, which provides:
 "(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents."
This court has stated that when ore tenus evidence is received in a case involving the termination of parental rights, the judgment of the trial court is presumed correct and will be set aside *Page 1032 
only if the record shows the judgment to be plainly and palpably wrong. L.A.G. v. State Dep't of Human Res., 681 So.2d 596, 598
(Ala.Civ.App. 1996). "`A natural parent has a prima facie right to the custody of his child, unless it can be proven by clear and convincing evidence that permanent removal of the child from the parent's custody would serve the best interests of the child.'"Id. at 598 (citation omitted). The paramount concern of a court in termination-of-parental-rights proceedings is the best interests of the child. In determining a child's best interests, a court must consider whether the parents are physically, financially, and mentally able to provide for the child. Id.
Additionally, when the State seeks to terminate a parent's parental rights, the court must apply a two-pronged test: First, a court must find that there are grounds for the termination of parental rights. Ex parte Beasley, 564 So.2d 950 (Ala. 1990). Second, after the court has found that there exist grounds to support the termination of parental rights, the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered. Id. at 954. Once a court has complied with this two-pronged test, it may order the termination of parental rights. Id.
 "Further, past history, as well as present circumstances, may properly be considered by the court in a termination proceeding. Fitzgerald v. Fitzgerald, 490 So.2d 4 (Ala.Civ.App. 1986). Still further, the mother's success or lack thereof in raising her other child[ren] is a factor for the court to consider in determining whether the evidence supports the termination of parental rights. Hayes v. State Dep't of Human Res., 563 So.2d 1035
(Ala.Civ.App. 1990)."
J.R. v. D.A.M., 615 So.2d 609, 612 (Ala.Civ.App. 1992).
The record reflects that S.B.L. had an extensive history with DHR, which began in 1981. She lost custody of her two older children in October 1991 because of circumstances similar to those in the present case.
In 1992 and 1996, respectively, the two minor children at issue in this case, C.D.B. and T.S.B., were born. In March 1998, a Child Abuse and Neglect ("CAN") report was filed alleging that the children were dirty and not properly clothed; the children were found in a vehicle with S.B.L. and her new paramour, when S.B.L. and the man were stopped for driving under the influence of alcohol. S.B.L. was so inebriated that she was unable to provide family contacts so that the children could be temporarily placed. As a result, the children were placed in foster care by DHR. DHR returned the children to S.B.L. in September 1998. In November 1998, DHR encountered the children while responding to another CAN report that had been filed in October 1998, which alleged that C.D.B. had bruises on his body while living in the home of a maternal aunt. The children had reportedly been placed in the aunt's care because S.B.L. had been incarcerated. Upon investigation, DHR found that the report was not correct as to the bruises; however, it found that housing was inadequate and placed the children in foster care until the mother's release from jail. Following the children's return to the mother's care, DHR had received reports that a staff member at C.D.B.'s day-care provider had smelled alcohol on S.B.L.'s breath; that S.B.L.'s teenaged son had picked up C.D.B. from day care; and that C.D.B. had been visibly ill, with his eyes matted, filled with mucous, and bloodshot when he was brought to DHR facilities by S.B.L. to visit his father. In April 1999, the children were again removed from the home because *Page 1033 
another CAN report had been filed alleging that T.S.B. had seen the mother put beer into C.D.B.'s bottle and that parties with excessive drinking had occurred at the home. C.D.B. was placed with his father and T.S.B. was placed in foster care. C.D.B. was returned to foster care in August 1999.
In September 1999, the mother was referred to the Intensive Outpatient Program ("IOP") at New Directions for treatment of her alcohol addiction; in October 1999, she was terminated from the program because of lack of attendance.
The children were placed with a maternal aunt from October 1999 through January 2000. During this period S.B.L. did not maintain contact with DHR. The children were returned to foster care on February 1, 2000. On February 14, 2000, S.B.L. married for the third time. S.B.L. reported to DHR that she had separated from her third husband in April 2000, but they had reconciled by May 15. She stated that they had separated because he had refused to participate in the reunification process and because he had had an extramarital affair.
Marsha Busby, the case worker from November 1998 to May 2000, testified that DHR had compiled an Individual Service Plan ("ISP") report in October 1999, detailing the goals that the mother would have to achieve in order to maintain a stable home for the children. The goals were to get a driver's license; to be alcohol and drug free or to reach sobriety; to maintain contact with her children; to have reliable transportation; to have stable housing; to be selective in her friends; to maintain stable employment; to be able to financially and emotionally support her children; and to be emotionally healthy. Additionally, S.B.L. was to ensure that all members of the household remain alcohol and drug free and that she and any household members submit to random drug and alcohol testing. In April 2000, the ISP required S.B.L. to attend IOP classes and Alcoholics Anonymous ("AA") meetings and to provide proof of her attendance. Busby stated that despite DHR's assistance the mother had not accomplished the aforementioned goals. Busby recommended termination of parental rights.
Tracey Owen testified that she was the case worker from June 2000 to September 2001, during which time DHR was seeking to terminate parental rights. She testified that the mother had missed 17 visits with the children since she had been assigned to the case. She recalled two instances when she suspected that the mother had been drinking. Owen requested that the mother submit to alcohol screenings on both occasions, but she refused. Owen stated that the mother was on her fourth attempt at completing the New Directions IOP program and was attending marriage counseling when she was assigned to the case. She stated that although DHR had implemented both programs the mother did not complete either program. She stated that the mother claimed that she was attending AA meetings, but that DHR did not have evidence of regular attendance.
Owen testified that after the mother had permanently separated from her husband she had relocated twice. From August 2000 to December 31, 2000, the mother resided in a mobile home until it was burned down by an ex-boyfriend. She then relocated twice more, but at the time of the hearing she had resided at the same residence since August 2001.
Owen testified that the mother had had five jobs between June 2000 and September 2000, two of which she held for only three days before she was either terminated or quit. In October 2000, the mother reported to DHR that she was working *Page 1034 
two jobs; however, when Owen attempted to verify the information, she was told that the mother had never worked for either entity. The mother reported no employment from October 2000 to February 2001. In February 2001, she reported that she was employed. By June 2001, she was employed elsewhere. In August 2001, she reported that she held positions at two fast-food establishments in Piedmont. Owen recommended termination of parental rights.
Lisa Camp testified that she has been the case worker since January 2002. She testified that the mother had missed 11 visits since she had been assigned to the case; however, some were rescheduled. She visited the mother's residence on two occasions and stated that it seemed appropriate. She testified that the mother was currently employed and that she had no concerns about her using alcohol or about the stability of the mother's housing, finances, or employment. She recommended termination of parental rights based solely on the mother's previous record. However, she stated that the children had stabilized with their foster parents and that the mother had not complied with court-ordered child-support payments.
Darlene Davis, a professional counselor, testified as an expert in the matter. She stated that one of the children had commented to her that the child had witnessed her mother engaged in sexual acts with different men and had witnessed the mother being physically abused by the same men. Davis supported the petition for termination of parental rights. She concluded that termination was preferable to long-term foster care because of the age of the children and because it provided a stable environment of being cared for, fed, sheltered, and clothed.
Greg Richards testified that he was the mother's outpatient therapist from October 2000 to November 2001. He stated that he stopped treating her because of her absenteeism. As a result, he concluded that he was not able to properly treat the mother's depression and alcoholism. He contended that the type of depression that the mother had been diagnosed with affects a person's ability to care for children.
The mother testified that she had maintained a stable home and stable employment for 10 months before the termination hearing. She stated that she takes prescription drugs for heart trouble and depression, including Xanax and Zoloft. She stated that she did not see the point in attending the New Directions IOP program, adding that no one could control her recovery except her. When asked directly about her attendance at AA meetings during the 10 months before the hearing, she said that she went to AA meetings at her leisure, stating that, "I try to go at least once per week, I mean, the way I feel about it if once per week helps me, then that should be up to me. Nobody can tell me how many times to go seven days a week or whatever, you know." (Emphasis added.) However, the record indicates that in January 2002, S.B.L. was questioned by DHR about her attendance at AA meetings; she replied, "I am not attending as I should." She further stated before the hearing that she had not attended AA meetings since December 2001, which was only four months before the hearing. She did, however, admit to drinking when the last CAN report was filed and DHR took her children in 1999. She also admitted that DHR had removed her two older children from her home and had placed them in foster care. She stated that she had not complied with the 1999 ISP; however, she stated that she would be willing to comply with protective services in order to acquire custody of her *Page 1035 
children, including attending counseling for her and the children and submitting to drug screenings (i.e., the basic components of her ISP).
Next, the mother contends that the trial court erred because it failed to require DHR to make reasonable efforts toward reunification of the family. We disagree.
The record shows that DHR attempted to reunify the family numerous times to no avail. After DHR removed the children from the home of a maternal aunt in November 1998, the children were returned to the mother's home upon her release from jail. Following a 30-day assessment, DHR implemented programs to address the mother's alcoholism, instability, living situation, and lack of income. DHR determined that the mother was financially unstable, and it recommended the Family Options Program ("FOP") as a solution. The FOP addressed household management, including basic needs for food, clothing, and shelter. DHR assigned a jobs case aide to the mother to counsel her and assist her in securing employment. The aide was able to assist her in finding a job at Hardees. However, the mother did not begin that employment because her boyfriend at the time demanded that she and the children leave his house immediately because he did not want them staying there any longer. Upon notification, DHR made immediate provisions for the mother and the children to live in a house, for which DHR would provide the deposit and first two months' rent. However, the mother reconciled with her boyfriend and the children remained in her custody.
On February 14, 2000, the mother married another man. Approximately 3 months later, following a permanency hearing, the court gave the mother and her third husband a 90-day extension to demonstrate stability, for the mother to express her needs to DHR, and to comply with the ISP. Similarly, DHR also afforded her additional time to demonstrate stability. DHR conducted follow-up visits to the home and included the husband in the family planning and visitation. DHR also implemented marriage counseling for the couple.
Last, the mother argues that the trial court erred because it failed to require DHR to show that there were no viable alternatives to termination. We disagree.
We note that, "[t]he trial court must consider the best interest of the child when looking at less drastic alternatives."Haag v. Cherokee County Dep't of Pensions and Sec.,489 So.2d 586, 588 (Ala.Civ.App. 1986).
The record indicates that DHR attempted to place the children with relatives, without success. As previously mentioned, the children had been placed with a maternal aunt; however, they were later removed when DHR determined that the home was substandard. From April 1999 to August 1999, one child was placed with his father; however, he was removed and placed in foster care because the father and his wife tested positive for drugs. DHR permitted the children to visit with their mother at another maternal aunt's home until the aunt notified DHR that she could no longer take care of children because of health problems and did not desire a long-term commitment to the children. DHR again considered the other aunt for possible placement; however, after inspection, DHR determined that placement with that aunt was not in the best interests of the children. DHR based this conclusion on the aunt's history with her own children, her past record involving C.D.B. and T.S.B., her lack of interest in maintaining medical examinations and treatment for the children, her failure to immunize and properly care for her animals, *Page 1036 
the number of CAN reports filed against her in the past, unsecured hazards on the property, and her lack of ability to provide security and protection from the mother.
Additionally, the court heard uncontradicted testimony that when T.S.B.'s father was contacted about the termination proceedings he indicated that the child was not his; he did not otherwise participate in the proceedings.
Last, the record reflects that no other relatives notified the court of any interest in having the children placed in their care and that the mother did not submit any names of relatives that were willing to be considered.
After reviewing the record, we cannot say that the trial court committed plain and palpable error in terminating the parental rights of the mother.
AFFIRMED.
THOMPSON, PITTMAN, and MURDOCK, JJ., concur.
CRAWLEY, J., dissents.