896 So.2d 416 (2004)
Ex parte J.R.
(In re J.R.
v.
State Department of Human Resources).
1021965.
Supreme Court of Alabama.
June 4, 2004.
*417 Martha E. Williams, Cullman, for petitioner.
William H. Pryor, Jr., atty. gen.; Nathan A. Forrester and J. Coleman Campbell, deputy attys. gen.; and Lynn S. Merrill and Connie M. Carraway, asst. attys. gen., Department of Human Resources, for respondent.
HARWOOD, Justice.
The petitioner, J.R., sought a writ of certiorari from this Court to review the Court of Civil Appeals' no-opinion affirmance of the juvenile court's termination of her parental rights to her minor child, J.L.R. We granted the writ on November 3, 2003, to consider J.R.'s contentions (1) that Darrell R. and Lisa R., the child's paternal uncle and his wife, might represent a viable custodial alternative to the termination of her parental rights and (2) *418 that prejudicial error occurred in connection with the admission at trial of a report containing hearsay.
The record reveals that on March 7, 2002, the Cullman County Department of Human Resources ("DHR") petitioned the Juvenile Court of Cullman County for permanent custody of J.L.R., stating:
"2. [J.L.R.] is a female, age nine (9), ... [J.L.R.] is a resident of and is presently living in Cullman County.
"3. The father of said child, [J.] ..., has served time in prison as a convicted sexual offender. He was convicted of raping his stepdaughter. The mother of said child is [J.R.]. She is a quadriplegic due to an automobile accident and is a resident at a nursing home....
"4. The name of the authority having custody, control, and supervision or guardianship of the person of the minor children is the Cullman County Department of Human Resources by Order of the Juvenile Court of Cullman County, Case Number JU-98-586.01, on December 4, 1998.
"5. The parents of [J.L.R.] are unable or unwilling to discharge their responsibilities to and for the child and/or the conduct or condition of the parents is such as to render them unable to properly care for the child and such conduct or condition is unlikely to change in the foreseeable future.
"6. The said child is dependent or neglected and in need of the protective care of the State of Alabama in that the father... has been convicted of a felony, abandoned the minor child and has failed to support the minor child. The mother ... is a quadriplegic and incapable of caring for herself or her minor children. Further, there has been a lack of effort by either parent to adjust his or her circumstances to met [sic] the needs of the minor child in accordance with agreements reached.
"7. The Department of Human Resources has used reasonable efforts to locate other viable family resources with which the child could be placed but no other variable [sic] family resources exist that are suitable to accept the minor child for placement.
"8. Reasonable efforts of the Cullman County Department of Human Resources leading toward rehabilitation have failed. The father and mother have failed to provide for the material needs or support of their child.
"9. The minor child has now been in the temporary custody of the Cullman County Department of Human Resources since December 4, 1998. Efforts to reunify the child with her mother and father have been unsuccessful and the Department believes that further efforts at reunification would be futile. Because of the child's need for safety, stability and permanency, it is in the best interest of said minor child that parental rights be terminated and said child placed for adoption."
The Cullman County Juvenile Court heard the matter on August 23, 2002, and entered the order terminating J.R.'s parental rights on September 23, 2002; that order stated, in pertinent part:
"1. In rendering a decision herein, all findings of this Court are based upon clear and convincing evidence.
"2. [J.], the biological father of [J.L.R.] was properly served with the Petition for Permanent Custody filed herein and also given notice of the date, place and time of the hearing on said petition. Upon the call of the case for trial, the father, [J.], failed to appear and the Court proceeded to hear evidence in the case.
"3. The Cullman County Department of Human Resources has exhausted all less restrictive alternatives to termination *419 of parental rights and the Court finds that there do not exist any alternative[s] less drastic than termination of parental rights available that would serve the best interest of the said minor child, [J.L.R.].
"4. The Cullman County Department of Human Resources has explored relative resources for the placement of the minor child, [J.L.R.], and the Court finds that placement of the minor child with relatives is not a viable alternative to termination of parental rights since no appropriate resources exist for either temporary or permanent custody.
"5. Reasonable efforts of the Cullman County Department of Human Resources to rehabilitate the mother and father of the minor child have failed and the Court finds that it is not in the best interest of the minor child to be returned on a temporary or permanent basis to the biological mother or the biological father.
"6. The Court finds by clear and convincing evidence that the above named minor child, [J.L.R.], is under the age of sixteen (16) years of age and is a resident of or physically located within Cullman County, Alabama; that the biological mother and biological father of the minor child are unable or unwilling to discharge their responsibilities to and for the minor child and the condition or condition [sic] of the mother and father is such as to render them unable to properly care for the minor child and such conduct or condition is unlikely to change in the foreseeable future.
"7. The Court further finds that the minor child is dependent and that there are no viable alternative[s] other than termination of parental rights.
"8. The Court further finds that the minor child, who has been in foster care for approximately three years, is highly adoptable.
"It is therefore ORDERED, ADJUDGED, and DECREED that any and all parental rights of the minor child's mother, [J.R.], and the minor child's father, [J.], are hereby permanently terminated and severed and that legal guardianship and permanent care, custody and control of said child, [J.L.R.], is hereby granted to the Cullman County Department of Human Resources, the said Department being granted full power to proceed with permanent plans and placement for said child. The Department shall have the right to place said child for adoption and consent to said adoption, and upon the entering of the final Order of Adoption by a Court of competent jurisdiction, the custody of the Cullman County Department of Human Resources and of this Court shall cease; otherwise it is to remain in full force and effect."
J.R. and Darrell R. and Lisa R.[1] separately appealed to the Alabama Court of Civil Appeals. In both appeals, the Court of Civil Appeals unanimously affirmed the decision of the juvenile court, without an opinion. J.R. v. Dep't of Human Res. (No. 2020042, June 13, 2003), 885 So.2d 859 (Ala.Civ.App.2003)(table), and D.R. & L.R. v. Dep't of Human Res. (No. 2020068, June 13, 2003), 885 So.2d 859 (Ala.Civ.App.2003). Darrell and Lisa did not petition this Court for certiorari review of the Court of Civil Appeals' decision. J.R. argues in her brief to this Court that (1) hearsay evidence in the form of a voluminous report marked as DHR Exhibit # 3 was improperly admitted into evidence in *420 the trial court, and (2) that her parental rights were terminated even though a viable family resource was available.

I. Facts
The record reveals that J. and J.R. had one child, J.L.R., a daughter, born to the marriage. J.R.'s daughter M.H. was also a member of the household unit, and the older of the two girls. In 1993, as a result of an automobile accident, J.R. became a quadriplegic. At the time of the accident, J.L.R. was a newborn and M.H. was approximately eight years old. As a result of that accident, M.H.'s responsibilities around the household increased dramatically and over time she became the primary caregiver for both J.R. and J.L.R. Her duties included feeding, washing, bathing, and clothing her half sister, and also taking care of household chores. The record indicates that by the time M.H. was 13 she was also responsible for driving the family's vehicle whenever that need arose.
In December 1998, the Cullman County DHR began an investigation into the household, based on a report that M.H. had become the primary caretaker in the household. The report indicated that M.H. had missed or been late to school approximately 29 times the previous school year because her household responsibilities prevented her from getting enough sleep. Also, it was alleged that J. had sexually abused M.H., beginning when she was nine years old, approximately three to four times a month. It was also alleged that the abuse sometimes took place in front of J.L.R. On December 4, 1998, J. admitted to sexually abusing M.H. and was charged with rape, sodomy, sexual abuse, and incest. That same day, J.L.R. and M.H. were placed in the temporary custody of DHR pending the outcome of a 72-hour hearing. J. subsequently pleaded guilty to three counts of sexual abuse in the first degree and was sentenced to three years in the state penitentiary. Because J. was to be incarcerated, the court returned J.L.R. and M.H. to J.R.'s custody on December 14, 1998.
The next day M.H. overdosed on Valium while at school. Methadone was also found in her possession. Testimony in the record reveals her reason for taking the Valium:
"Q [Counsel for DHR]: Were you removed after the incident with the pills?
"A [M.H.]: Yes
"Q: Okay. Tell us a little bit about that. Did you take those pills on purpose or was it accidental?
"A: No. I took them on purpose. It wasn't, oh, let me take these so I can kill myself because more or less, yes, I know the consequences if I was to take too many.
"Q: Right.
"A: I just needed it right then and there to be mentally away from all the stress and the depression and everything that was going on.
"Q: Right
"A: It was too much for me to handle.
"Q: Okay. Was there any particular incident that triggered you taking the pills on that particular time that you took them?
"A: There was a few arguments about stuff that had happened and we argued.
"....
"Q: And what did your mother say  what did your mother say to you regarding the allegations you made against [J.]?
"A: I don't remember exactly. But I remember feeling that if I would have kept my mouth shut that none of it would have happened, and we still would have had the family together.

*421 "Q: Did your mother tell you that, that if you had not turned [J.] in that the family would still have been together?
"....
"Q: Is that what you told the DHR worker?
"A: I believe so."
Shortly thereafter, DHR removed both children from the household, placing J.L.R. in foster care and M.H. with her father. J.L.R. was reunited with J.R. in January 1999. The reunification took place in the home of J.R.'s parents, who lived "across the road" and "up the hill" from J.R.'s house. Also living at that residence was J.R.'s mentally handicapped younger sister. J.R., J.L.R., and J.R.'s younger sister all shared one room while J.R. and J.L.R. lived with J.R.'s parents.
On May 6, 1999, DHR allowed J.R. and J.L.R. to return to J.R.'s house, but mandated that an adult, other than J.R., be present at all times. DHR subsequently received a report from J.L.R.'s school that she was coming to school unkempt and that her clothes were not clean. Shortly after receiving that report, DHR removed J.L.R. from J.R.'s custody and placed her back in foster care for the following reasons:
"Q [Counsel for DHR]: All right. And do you know why [J.L.R.] was picked up from her mom's house in the summer of 1999?
"A [Wanza Akridge, DHR social worker]: Actually, it was probably not very long at all because school was still in session and [J.L.R.] was coming to school with her hair not brushed, her teeth not brushed. She was in general showing very poor hygiene and DHR investigated, and she was placed in foster care.
"Q: Was that the reason why [J.L.R.] was removed from her mother's house on that occasion in May of '99?
"A: And also [DHR] learned that [J.R.'s mother] had stated that she had rather stay at her own home than stay at [J.R.'s] home at night.
"Q: And why was that significant to you?
"A: Why is that significant? Because we had to have an adult other than [J.R.] in the home at all times.
"Q: That was part of the safety plan, that an adult was supposed to be present at all times?
"A: That's correct."
Because J.R.'s mother wanted to sleep in her own bed, she started leaving J.R. and J.L.R. alone and unattended at night.
On July 6, 1999, J.R. was evaluated by Patrick Dunne, a psychologist at Altamount Counseling Associates. In his report, which came into evidence as a part of the challenged DHR Exhibit # 3, he concluded that J.R. appeared to be incapable of placing her children's needs above her own. Specifically, he reported:
"[J.R.] apparently is unable to care for her children. She appeared emotionally to be unable to do so as well. She was reported to have placed her children in a care-giving role to the point her fourteen-year-old daughter does not wish to return home. Today's evaluation suggests [J.R.] is likely to have difficulty appropriately parenting her children. She appeared likely to have problems with placing her needs above those of her children and to have difficulty taking care of their needs as a result. An example is her lack of involvement in her fourteen-year-old daughter's treatment for sexual abuse. [J.R.] presented this as due to being told she could not discuss her daughter's case. That may have been the situation prior to [J.'s] trial, but there would be no need to maintain such a restriction now. In fact it would be beneficial to her daughter to *422 have her mother involved in any treatment she might receive for the sexual abuse. It appeared to be likely that [J.R.'s] defensiveness regarding this is designed to deal with her needs, thus placing her fourteen-year-old daughter's needs second. Based on these results I would strongly recommend against returning [J.R.'s] children to her custody. She is unlikely to benefit from individual counseling as she is so much in denial. If there were a need she could be given a period of four or five counseling sessions to assess her commitment to change. The prognosis, however, must be considered poor. [J.R.] is also unlikely to benefit from parenting classes for the same reason."
In September 1999, DHR conducted a home evaluation of the residence of J.R.'s parents to determine whether it was a suitable environment for J.L.R. The report of this home evaluation, entered into evidence also as a part of DHR Exhibit # 3, concluded that it was not, stating, in pertinent part:
"Recommendations
"The Cullman County [DHR] recommends that [J.L.R.] remain in the temporary custody of the department and continue to live in her present foster home. [J.L.R.] is doing well with her placement in this foster home. There are great concerns as to the capability and the willingness of [J.R.'s parents] to protect the child and keep her safe as well as being able to provide for her."
(Emphasis added.) On April 3, 2000, J.R. was seen by Dr. Donald Garcia. According to a lengthy "consultation" report he authored, which came into evidence as a part of DHR Exhibit # 3, he was asked to perform a psychiatric evaluation of J.R. because of rectal and vaginal injuries she had sustained during "consensual sex" with a boyfriend. Dr. Garcia concluded in his report that J.R. was mentally and emotionally unable to make sound decisions, finding that "[t]he patient has a habit of minimizing her responsibility for problems, minimizing the poor choices she has made, and has not shown very much responsibility or good judgment in handling her injury and subsequent needs," and that "[t]he patient has demonstrated an inability to make sound judgments which has affected not only her own health but the health and welfare of her children."
Soon after Dr. Garcia's report, J.R.'s parents decided they could no longer take care of her needs and placed her in a nursing home. Meanwhile, beginning in 2000, Darrell and Lisa began expressing interest in being considered as a viable family resource. Darrell was in the United States Army and they were based in North Carolina at the time. The North Carolina counterpart to DHR approved them as a relative resource through the Interstate Compact on the Placement of Children ("ICPC"). Later that year, however, Darrell was transferred to Alabama. He requested a home study be done on his residence, which, according to his testimony, was denied because "[DHR social worker Akridge] petitioned the Court that I not get to see [J.L.R.] again and that I couldn't get visitation at that time." Darrell contacted the Cullman County DHR again in March 2002, requesting he be allowed to visit J.L.R. and take her on a trip to Walt Disney World. DHR denied this request because, it says, there was a lack of substantial relationship between Darrell and J.L.R.
At the time of the August 2002 termination hearing, J.R. was in need of 24-hour care and admitted to the court that she was not physically able to care for herself or J.L.R.:
"Q [Counsel for J.R.]: You are a quadriplegic, however, is that right?
"A: Yes, ma'am

*423 "Q: So you need help in bathing and in your daily activities, 24-hour care pretty much; is that fair to say?
"A: Yes.
"Q: So we'll just get it out on the table right now. You're not able physically to take care of [J.L.R.] by yourself, is that right?
"A: Right."
After the hearing, the court entered a final judgment terminating J.R.'s parental rights as to J.L.R.

II. Termination
The legal standards governing the process of the termination of parental rights are well settled.
"Although a child's parents have a prima facie right to custody, the paramount concern in these proceedings is the child's best interests. In determining the child's best interests, the court must examine whether the parents are physically, financially, and mentally able to provide for the child. If clear and convincing evidence reveals that the parents cannot, or are unwilling to, discharge these responsibilities, parental rights may be terminated."
J.V. v. State Dep't of Human Res., 656 So.2d 1234, 1235 (Ala.Civ.App.1995) (citations omitted).
In Ex parte Brooks, 513 So.2d 614 (Ala.1987),[2] this Court stated:
"Before parental rights will be terminated, the Court must determine from clear and convincing evidence that the child is dependent and, after having made a finding of dependency, must determine whether there exists a remedy less drastic than termination of those rights."
513 So.2d at 617. The legal principles noted in these authorities have resulted in a two-pronged test that has been implemented and followed by the Court of Civil Appeals in parental-rights-termination cases:
"When acting on a nonparent's petition, the court must apply a two-pronged test before terminating the parent's rights. First, the court must determine that the child is dependent. J.L.B. [v. State Department of Human Resources, 608 So.2d 1367, 1368 (Ala.Civ.App.1992)]. Second, the court must find that there exists no viable alternative to termination of parental rights. Id. The ore tenus rule applies in cases involving termination of parental rights. When the evidence is presented ore tenus, the judgment of the trial court is `presumed correct and will be set aside only if the record reveals the judgment to be plainly and palpably wrong.' Id. at 1368."
G.D.M. v. State, 655 So.2d 1020, 1022 (Ala.Civ.App.1995). See also L.A.G. v. State Dep't of Human Res., 681 So.2d 596 (Ala.Civ.App.1996); J.W. v. Mobile County Dep't of Human Res., 677 So.2d 782 (Ala.Civ.App.1996).
J.R. concedes that the first prong of the test was met. It is the second prong  the determination that there was no viable alternative to the termination of her parental rights  that she argues has not been met.
This case presents an unusual situation. Although J.R.'s parental rights were terminated, she is not the one seeking to regain custody of J.L.R.; rather, she challenges the termination on the ground that Darrell and Lisa were a viable family resource and, therefore, that there were less drastic measures for the court to take than terminating her parental rights. *424 J.R., along with Darrell and Lisa, insisted in their briefs to the Court of Civil Appeals that "[d]uring the trial both the uncle and aunt and the maternal grandparents of the minor child presented themselves to the Court as ready[,] willing and able to take custody of [J.L.R.] ..."
Akridge testified that there were two main reasons DHR did not consider Darrell and Lisa a viable family resource. First, DHR was concerned with the amount of contact Darrell would have with his brother J., J.L.R.'s father, who had been convicted of sexually abusing J.L.R.'s half sister, M.H. When asked why Darrell and Lisa were no longer being considered a viable family resource, Akridge replied:
"A: And he was also observed  when he came to the hearing in November 2001, he was observed to be with his brother, [J.], that day.
"Q [Counsel for DHR]: [J.] is the father of [J.L.R.]?
"A: That's true.
"Q: And why was that  why did that cause DHR concern?
"A: Because [J.L.R.] is not to have any contact with her father.
"Q: As a result of the sexual-abuse conviction?
"A: Therefore, if [Darrell] has a relationship, a close relationship with his brother, we do not feel like he would be a protector for [J.L.R.]
"Q: Do you have an opinion as to whether termination of the parental rights of [J.L.R.'s] parents would be the least restrictive option available at this point that would be in the best interest of [J.L.R.]?
"A: I see no other alternative because her mother is not able to take care of her at this time because where she lives she cannot have a child there, and we do not feel that she is safe with her father."
As noted above, this concern regarding Darrell's contact with his brother stemmed from Akridge's observation of J. and Darrell together outside the courthouse after the November 2001 custody hearing. However, Darrell testified as follows concerning the events of that day:
"Q [Counsel for Darrell]: Well, Ms. Akridge made some comments earlier that she was concerned that you would not protect [J.L.R.] because she saw you talking to your brother after court in November.
"A: Right.
"Q: Do you remember that occasion?
"A Yes, I do. I went  my mother asked me that after the court if I would bring my brother up to see her so I pretty much gave him a ride up to see her and then I left.
"Q: So, basically, your extent of contact with your brother was taking him to see y'all's mother?
"A: Right.
"Q: When was the last time she had seen him?
"A: It had been like three years or so that I know of.
"Q: Before you saw him that day, when was the last time you had seen him?
"A: A little longer than that. It's been a little longer than three years.
"....
"Q: So, if you were to get custody of [J.L.R.], [J.] would not be allowed around her.
"A: [J.] is not allowed in my house. I'll talk to him on the phone but that's the extent of the relationship.
"Q: You would not take [J.L.R.] to where he was, would you?
"A: No, I wouldn't. I'd need to  I guess I'd have to have grandfather come up to see us.[[3]] That's the only option."
*425 Further, Akridge admitted that she merely observed Darrell and J. together once and that she had no knowledge of the reason of their interaction on that occasion.
"Q [Counsel for J.R.]: And from [the observation of Darrell with J.] you deducted [sic] that he must have a close relationship with his brother and would not protect [J.L.R.] from contact if that were what was in her best interest?
"A: That's true?
"Q: From the one observation of him with his brother?
"A: That's true."
Thus, Akridge's fears that there would be a relationship between Darrell and J., though heightened during the observation of the two together, could have been allayed after an investigation of the facts of Darrell's relationship with his brother. There is no indication, however, that DHR ever undertook such an investigation.
Akridge's second reason for rejecting Darrell and Lisa for custody consideration as a viable alternative less drastic than the termination of J.R.'s parental rights was based on the alleged lack of efforts by Darrell and Lisa to establish and maintain a relationship with J.L.R. Akridge testified:
"Q [Counsel for DHR]: And what does DHR policy call for when you have people that live outside the state of Alabama that have expressed an interest in getting custody of a child who is in DHR's legal care and custody?
"A: We go through the Interstate Compact on the Placement of Children and request a home evaluation.
"....
"A: I'm not sure the exact date that they moved, but I did not know that [Darrell] had moved to Alabama until March of 2002, and at that time I called North Carolina and they also  there [sic] were not aware. It had not been reported to them that he had left North Carolina, but at that time, they did close their ICPC case.
"....
"Q: Well, as part of your investigation did you determine how much contact [J.L.R.] had had with [Darrell] prior to DHR being given custody in December 1998? Do you know whether [J.L.R.] had ever visited with [Darrell] prior to DHR taking custody in December 1998?
"A: I'm not aware of how many visits but 
"Q: Did [J.L.R.] know who 
"A:  I don't believe [J.L.R.] really knew who they were.
"....
"Q: Are you aware of any letters that [Darrell] has written to [J.L.R.] since she's been in care?
"A: I'm not aware of any letters. They sent a couple of gifts.
"....
"Q: And what about telephone calls? Are you aware of any telephone calls?
"A: I'm not aware of any telephone calls.
"....
"Q: So since March 2002 had DHR heard anything at all from [Darrell]?
"A: I have not.
"Q: And had DHR considered [Darrell] as a family resource for [J.L.R.]?
"A: Not at this time because [J.L.R.] does not have a relationship with [Darrell and Lisa]. And she does not  she has stated she does not want to live with them. She only wanted the visits supervised, or she wanted her sister to be present at the visits.
"....
"Q: Since March 2002 have you had any voice-mail message from [Darrell]?
"A: I have not.

*426 "Q: Okay. Have you received any written correspondence from [Darrell] since March 2002?
"A: I have not.
"Q: Has any supervisor of yours indicated that [Darrell] has attempted to contact you since March 2002?
"A: Just in March.
"Q: Since March 2002.
"A: No."
However, Darrell testified as follows:
"Q [Counsel for J.R.]: [Darrell], when you first learned that your niece [J.L.R.] needed some kind of foster care or was going to be removed from her home, you contacted the authorities here in Alabama; is that correct?
"A: Right.
"Q: Would it be fair to say that the Department of Human Resources has stood in your way or would you be more accurate to say that they have tried to assist you in being a resource for your niece?
"A: There was [sic] a lot of things that DHR has not told me. I had to learn from my DHR in North Carolina.
"Q: Such as?
"A: Visitations, the home studies, and that during the court day that [J.L.R.] should have been there at the court day, and that if we were awarded custody would get to take her right then with a possible three-day grace period, stuff like that.
"Q: And did Ms. Akridge make herself available to answer questions that you had?
"A: Not all the time, no."
Further testimony from Darrell regarding his alleged failure to maintain a relationship with [J.L.R.] included the following:
"Q [Counsel for Darrell]: How many times have you been able to visit [J.L.R.] since this started?
"A [Darrell]: I visited [J.L.R.] approximately five times since I have seeked [sic] custody.
"Q: Have you made attempts to get more visitation with [J.L.R.]?
"A: Yes, I have.
"Q: And what happened when you made those attempts?
"A: Well, I would start off trying to call Wanza [Akridge] at DHR or call the DHR guys. I left a message on the phone. Sometimes the phones were full of messages so you couldn't leave one. I've left messages with the secretary to have Wanza call back or give us some information and never got a phone call back.
"Q: Has she ever called you back about visitation?
"A: I don't remember if she ever called me back for visitation. As far as I know, all my visitations were allowed after I got here and asked for it once I was here.
"....
"Q: Did you request a home study of your home ...?
"A: Yes, I did, when I came down I think it was in March of this year I asked her.
"Q: And what was her response?
"A: Her response was that she petitioned the court that I not get to see [J.L.R.] again and that I couldn't get visitation at that time.
"Q: Did she say why?
"A: No, she wouldn't exactly tell me why. She told me I had to go see my lawyer."
In fact, Akridge admitted the following:
"Q [Counsel for Darrell]: Are you aware of when [Darrell and Lisa] first filed their petition for temporary custody of [J.L.R.]?

*427 "A: I'm not aware of when they 
"Q: If I told you sometime in October 2000, would that sound right to you?
"A: I'm not aware of when they filed their petition.
"Q: Are you aware of when they requested a home study in North Carolina?
"A: After they moved back to the States.
"Q: So that would  if I said that would have been there sometime in October of 2000 when they were there, that would have been about that time, right?
"A: I'm just aware there was an [Individualized Service Plan] to start the visitation in November.
"Q: Are you aware of when the home study was done? "A: I'm not aware. Sometime in that following spring but I'm not aware of the exact month.
"Q: In fact, there were two home studies done in North Carolina; is that correct? One on the apartment and then when they moved to Fayette, the house they lived in there?
"A: I only know of one home evaluation.
"Q: Okay.
"A: The worker may have gone out twice. She may have had to go out twice before she completed it.
"Q: And it was approved, is that correct?
"A: It was approved.
"Q: There were no problems with 
"A: The worker in North Carolina 
"Q: [Darrell and Lisa]? Have you ever done anything personally to investigate [Darrell and Lisa] as a family resource for [J.L.R.]?
"A: I've not done anything personally. I have only observed him with his brother after the last court hearing, which was a concern."
The only inference to be drawn from this evidence is that Darrell and Lisa had offered themselves as a custodial resource for J.L.R., but DHR, by Akridge's admission, did not fully investigate their potential as a viable family resource before deciding that they did not qualify as a viable resource.
Darrell has been employed with the United States Army for almost 17 years; his current rank is staff sergeant. When questioned about his home life, Darrell stated the following:
"Q [Counsel for Darrell]: How long have you been married?
"A: Eight years.
"....
"Q: Do y'all have any children?
"A: We have two children.
"Q: What are their names?
"A: [C.] is the oldest, ... and [L.] is the youngest.
"Q: Okay. And are y'all buying a home ...?
"A: Yes, we've bought a home.
"Q: Would you describe that for me, please?
"A: My home is a brick home, it's on approximately one acre of land, its got four bedrooms, it's got two baths, it's got a huge living room, dining room, it's got a kitchen, it's got a back porch, it's got a two-door garage that was converted into a game room but we converted it into another bedroom, it's got two fireplaces, got a shed, work shed out back and the yard, is all fenced in.
"....
"Q: What type of benefits do you have?
"A: I have medical, dental extended to my family members. We have any kind of medical anything that we need is provided by the military at no cost to us.
"....

*428 "Q: What about schools in the community you live in?
"A: I have a school it's just about half a mile from my house. It's just across the street.
"Q: Do you have the financial ability to care for another child?
"A: Yes, I do.
"Q: So you could provide a good stable home for [J.L.R.] if you were to receive custody?
"A: Yes, I could provide a very loving and stable home for her."
"DHR  not the prospective custodian  has the burden of initiating investigations, and it is DHR's burden to prove the unsuitability of one who seeks to be considered as the custodian of a dependent child." D.S.S. v. Clay County Dep't of Human Res., 755 So.2d 584, 591 (Ala.Civ.App.1999).
The record clearly indicates that Darrell and Lisa expressed an interest in being considered as a relative resource and pursued that interest through two levels of court proceedings. DHR presented no evidence that clearly indicated why Darrell and Lisa were "unsuitable" as an alternative family resource, a decision far less drastic than terminating J.R.'s parental rights. Accordingly, the order of termination was erroneous on that account, and the judgment of the Court of Civil Appeals affirming that order is reversed and this cause is remanded for the Court of Civil Appeals to remand it to the trial court for further proceedings consistent with this opinion.
Because we are remanding the cause for further proceedings, we also address briefly the hearsay issue. As recently confirmed in Y.M. v. Jefferson County Department of Human Resources, 890 So.2d 114 (Ala.2004), a parental-rights-termination hearing is an adjudicatory proceeding at which hearsay evidence is inadmissible.
"Because of the finality of the determination of a trial court to terminate a parent's rights, the proceeding in the trial court is clearly conducting an adjudicatory proceeding. Therefore, we agree with the Court of Civil Appeals that a proceeding to terminate a parent's rights pursuant to § 26-18-7, Ala.Code 1975, is an adjudication.
"We further recognize, as did the Court of Civil Appeals, that only competent, material, and relevant evidence may be admitted during an adjudicatory proceeding to terminate a parent's rights. See § 12-15-65(f), and 26-18-7(a), Ala.Code 1975. Additionally, we acknowledge, as did the Court of Civil Appeals, that hearsay evidence is not considered competent evidence in an adjudicatory proceeding, unless it falls within one of the exceptions provided by the Alabama Rules of Evidence, other rules adopted by this Court, or by statute. Rule 802, Ala. R. Evid. Hearsay evidence is admissible at an adjudicatory hearing if it falls within one of the exceptions provided in Rules 803 and 804, Ala. R. Evid. For example, Rule 803(6), Ala. R. Evid., provides that records of regularly conducted activity are not excluded by the hearsay rule. See L.A.C v. State Dep't of Human Res., 890 So.2d 1026 (Ala.Civ.App.2003) (analyzing a report to determine if it was admissible as a business record pursuant to Rule 803(6), Ala. R. Evid.)."
Y.M., 890 So.2d at 117-118 (footnote omitted).
In the parental-termination proceeding underlying the appeal in L.A.C. v. State Department of Human Resources, 890 So.2d 1026 (Ala.Civ.App.2003), referenced in Y.M., the trial judge allowed a DHR social worker to vouch for a report contained in the DHR file that had been prepared by an employee of the Children's *429 Hospital intervention program. The mother whose parental rights DHR was seeking to terminate objected to the admission of the report on the ground that the report was hearsay, arguing that the proper foundational witnesses were the personnel of the Children's Hospital intervention program responsible for the report.
"DHR argued at trial, and now maintains on appeal, that, because the report was sent to DHR and kept in DHR's files, it was DHR's business record pursuant to Rule 803(6), Ala. R. Evid. Rule 803(6) states:
"`A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.'
"(Emphasis added.) DHR's argument  that the foundation for admitting a report as a business record may be satisfied by one to whom the report was sent rather than by one whose business it was to make the report  has been rejected by the Alabama Supreme Court. See Ex parte Frith, 526 So.2d 880 (Ala.1987)."
L.A.C., 890 So.2d at 1034.
Ex parte Frith, 526 So.2d 880 (Ala.1987), is indeed apposite authority, establishing that the recipient and custodian of a letter received by a psychiatric social worker in the regular course of her business could not testify that the letter was made in the regular course of her business because the letter was authored by a third party, a staff psychiatrist at Bryce Hospital, who was not associated with the recipient's business in any way.
Akridge's predicate testimony was as follows:
"Q. Let me show you what's been marked as DHR Exhibit # 3 and I'll ask you if you can identify what that is?
"A. This is the permanent custody court report.
"Q. Okay. Is that a DHR record?
"A. Yes, it is.
"Q. Has that been filed in this case?
"A. Yes, it has.
"Q. All right. And is that a normal and regular practice of the Department to make and maintain such records?
"A. That's correct.
"Q. Was the record maintained in this case, the events that are transcribed in that record, were they made at or about the time that the events described occurred?
"A. That's correct, and all the information is based on information in the DHR file.
"Q. Okay. And I believe you've already testified that it is the regular practice of the DHR to keep and maintain those records?"
In light of the holdings of Y.M. and L.A.C., supra, the trial court should consider in connection with the further proceedings to be conducted on remand in this case whether Akridge's testimony was sufficient to lay the proper predicate under Rule 803(6) for admission of all of the reports contained in DHR Exhibit # 3.
*430 For the reasons stated herein, the judgment of the Court of Civil Appeals is reversed, and the cause is remanded.
REVERSED AND REMANDED.
HOUSTON, SEE, LYONS, BROWN, JOHNSTONE, WOODALL, and STUART, JJ., concur.
NOTES
[1] Darrell is J.'s brother, and he and his wife Lisa assert that they represent a viable family resource. They participated in the proceedings in the juvenile court, where they were represented by counsel.
[2] Ex parte Brooks has been overruled to the extent it held that a parent must prove a child is "dependent" before seeking to terminate the rights of the other parent. Ex parte Beasley, 564 So.2d 950 (Ala.1990).
[3] J. was living with his parents at this time.